Ilsa KLINGHOFFER and Lisa Klinghoffer Arbitter, as Co-Executrixes of the Estates of Leon and Marilyn Klinghoffer, Plaintiffs-Appellees,

v.

S.N.C. ACHILLE LAURO ED ALTRI-GESTIONE MOTONAVE ACHILLE LAURO IN AMMINISTRAZIONE STRAORDINARIA; Commissario of the Flotto Achille Lauro in Amministrazione Straordinaria; Chandris (Italy) Inc.; Port of Genoa, Italy; Club ABC Tours, Inc.; Crown Travel Service, Inc., doing business as Rona Travel, and/or Club ABC Tours, Defendants-Appellees.

Sophie CHASSER and Anna Schneider, Plaintiffs-Appellees,

v.

ACHILLE LAURO LINES, The Lauro Lines Flotto Achille, Chandris Cruise Lines and ABC Tours Travel Club, Defendants-Appellees.

Viola MESKIN, Seymour Meskin, Sylvia Sherman, Paul Weltman and Evelyn Weltman, Plaintiffs-Appellees,

v.

ACHILLE LAURO LINES, The Lauro Lines Flotto Achille, Chandris Cruise Lines and ABC Tours Travel Club, Defendants-Appellees.

Donald SAIRE and Anna G. Saire, Plaintiffs-Appellees,

v.

ACHILLE LAURO ED ALTRI-GESTIONE M/N ACHILLE LAURO S.N.C. COMMISSARIO LAURO S.N.C., Commissario of the Flotto Achille Lauro in Amministrazione and Chandris, Inc., Defendants-Appellees.

Frank R. HODES and Mildred Hodes, Plaintiffs-Appellees,

v.

PALESTINE LIBERATION ORGANIZATION, an Unincorporated Association, John Doe, President, PLO and Richard Roe, Treasurer, PLO, Defendants-Appellants.

Donald SAIRE and Anna G. Saire, Plaintiffs-Appellees,

v.

PALESTINE LIBERATION ORGANIZATION, an Unincorporated Association, John Doe as President and Richard Roe as Treasurer of the Palestine Liberation Organization, Defendants-Appellants.

No. 1371, Docket 90-9060.

United States Court of Appeals, Second Circuit.

Argued March 27, 1991.

Decided June 21, 1991.

Ramsey Clark, New York City (Lawrence W. Schilling, of counsel), for defendants-appellants Palestine Liberation Organization, John Doe and Richard Roe.

Jay D. Fischer, New York City (Stephen Obus, Juliet M. Sarkessian, Proskauer, Rose, Goetz & Mendelsohn, of counsel), for plaintiffs-appellees Klinghoffer Arbitter and Hodes.

Rodney E. Gould, Framingham, Mass. (Rubin, Hay & Gould, of counsel), for plaintiffs-appellees Club ABC Tours, Inc.; Crown Travel Service, Inc. and/or Club ABC Tours dba Rona Travel; and ABC Tours Travel Club.

Daniel J. Dougherty, New York City (Todd L. Platek, Kirlin, Campbell & Keating, of counsel), for plaintiffs-appellees Chandris (Italy) Inc.; Port of Genoa, Italy; Chandris Cruise Lines; and Chandris, Inc.

Arthur M. Luxemberg, Law Office of Perry Weitz, New York City, of counsel, for plaintiffs-appellees Chasser, Meskin, Schneider, Sherman and Weltman.

William Larson, Jr., Newman, Schlau, Fitch & Burns, New York City, of counsel, for plaintiffs-appellees Saire.

Raymond A. Connell, Connell Losquadro & Zerbo, New York City, of counsel, for plaintiffs-appellees S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria; Commissario of the Flotta Achille Lauro in Amministrazione Straordinaria; Achille Lauro Lines; Achille Lauro Ed Altri–Gestione M/N Achille Lauro S.N.C.; The Lauro Lines Flotta Achille; Commissario Lauro S.N.C.; and Lauro Lines s.r.l.

Steven M. Freeman, Tamar Sadeh Ellison, Justin J. Finger, Jeffrey P. Sinensky, Ruth L. Lansner, Anti–Defamation League,

of counsel, for amicus curiae Anti–Defamation League.

Before OAKES, Chief Judge,
TIMBERS and KEARSE, Circuit Judges.

OAKES, Chief Judge:

The Palestine Liberation Organization (the "PLO") appeals from a judgment of the United States District Court for the Southern District of New York, Louis L. Stanton, *Judge*, reported at 739 F.Supp. 854, denying its motion to dismiss various complaints brought against it in connection with the October 1985 seizure of the Italian passenger liner Achille Lauro and the killing of passenger Leon Klinghoffer. The district court rejected the PLO's claims that it is immune from suit in United States courts, that the complaints against it raise non-justiciable political questions, that service of process on its Permanent Observer to the United Nations (the "UN") was insufficient under Rule 4 of the Federal Rules of Civil Procedure, and that personal jurisdiction could not be asserted over it in the state of New York. For the reasons set forth below, we agree with the district court that the PLO is not immune from suit and that this case does not present a non-justiciable political question. However, because we conclude that the remaining questions cannot be resolved on the record before us, we vacate the judgment of the district court and remand the case for further findings.

## BACKGROUND

### 1. *The PLO and its Activities in New York*

The PLO, which is headquartered in Tunis, Tunisia, describes itself as

the internationally recognized representative of a sovereign people who are seeking to exercise their rights to self-determination, national independence, and territorial integrity. The PLO is the internationally recognized embodiment of the nationhood and sovereignty of the Palestinian people while they await the restoration of their rights through the establishment of a coomprehensive [sic], just and lasting peace in the Middle East.

739 F.Supp. at 857 (quoting affidavit of Ramsey Clark). On November 15, 1988, the Palestine National Council issued a Declaration of Statehood, proclaiming the existence of the State of Palestine and vesting the powers of the provisional government in the executive committee of the PLO. The United States does not give diplomatic recognition to Palestine, although several other nations do.

Since 1974, the PLO, through its representative Zuhdi Labib Terzi, has participated at the UN as a permanent observer. To support its activities at the UN, the PLO purchased a building in Manhattan, which it uses as its UN Mission (the "Mission"). Mr. Terzi and his family reside at the Mission, and eight other employees work there as well. From time to time, other high-ranking officers of the PLO, including its Chairman, Yassar Arafat, use the Mission. In addition to owning a building, the PLO owns an automobile and maintains a bank account in New York, and has a telephone listing in the NYNEX white pages. From time to time, the PLO has engaged in various fundraising and propaganda efforts in New York and elsewhere.

In 1987, Congress enacted the Anti–Terrorism Act (the "ATA"), 22 U.S.C. §§ 5201–5203 (1988), which makes it unlawful "to receive anything of value except informational material from the PLO" or "to expend funds from the PLO" if the purpose is to further the PLO's interests. *Id.* § 5202(1)–(2). The ATA also forbids the establishment or maintenance of "an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof." *Id.* § 5202(3). The ATA does not apply, however, to the PLO's Mission in New York. *See United States v. Palestine Liberation Organization*, 695 F.Supp. 1456, 1464–71 (S.D.N.Y.1988).

## 2. The Achille Lauro Hijacking

On October 7, 1985, four persons seized the Italian cruise liner Achille Lauro in the Eastern Mediterranean Sea. During the course of the incident, the hijackers murdered an elderly Jewish–American passenger, Leon Klinghoffer, by throwing him and the wheelchair in which he was confined overboard. Shortly after the incident, the hijackers surrendered in Egypt. They were then extradited to Italy, where they were charged and convicted of crimes related to the seizure.

At this point, it remains unclear what role, if any, the PLO played in the events described above. According to some reports, the seizure was undertaken at the behest of Abdul Abbas, who is reportedly a member of the PLO. The PLO, however, denies any responsibility for the hijacking, and maintains that its involvement in the affair was limited to helping to secure the surrender of the hijackers and to ensure the safety of the ship and its passengers.

On November 27, 1985, Marilyn Klinghoffer [1] and the estate of Leon Klinghoffer filed suit in the Southern District of New York against the owner of the Achille Lauro, the charterer of the vessel, two travel agencies, and various other defendants. Other passengers who were aboard the Achille Lauro during the hijacking also commenced actions in the Southern District against the ship's owner and charterer, as well as against the travel agencies. The defendants in these actions then impleaded the PLO, seeking indemnification or contribution, as well as compensatory and punitive damages for tortious interference with their businesses. On October 7, 1988, two other passengers on the Achille Lauro brought separate actions in the Southern District against the PLO directly.

On April 27, 1987, the PLO moved to dismiss the third party complaints against it. This motion was later extended to encompass the two direct suits as well. In an opinion and order dated June 7, 1990, the court denied the PLO's motion. The PLO then moved for reargument, as well as for certification of the case for interlocutory appeal. The court denied the PLO's motion for reargument, but granted the motion for certification. Thereafter, in an opinion dated December 7, 1990, we granted the PLO's petition for permission to appeal, see 921 F.2d 21, and this appeal followed.

## DISCUSSION

### 1. Immunity from Suit

■ The PLO first argues that it is a sovereign state and therefore immune from suit under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602 *et seq.* (1988). As support for this argument, it relies on its "political and governmental character and structure, its commitment to and practice of its own statehood, and its unlisted and indeterminable membership." Brief for Appellant at 7. However, this Court has limited the definition of "state" to " 'entit[ies] that ha[ve] a defined territory and a permanent population, [that are] under the control of [their] own government, and that engage[ ] in, or ha[ve] the capacity to engage in, *formal relations with other such entities.*'" *National Petrochemical Co. v. M/T Stolt Sheaf,* 860 F.2d 551, 553 (2d Cir.1988) (quoting *Restatement (Third) of the Foreign Relations Law of the United States* § 201 (1987)), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989). It is quite clear that the PLO meets none of those requirements.

First, the PLO has no defined territory. To be sure, the PLO's November 15, 1988 Declaration of Statehood "contemplates" that the state's territory will consist of the West Bank, the Gaza Strip, and East Jerusalem. The fact that the PLO hopes to have a defined territory at some future date, however, does not establish that it has a defined territory now. Indeed, the Declaration's assertion that "[t]he State of Palestine is the state of Palestinians wherever they may be" underscores the PLO's current lack of a territorial structure. In addition, because the PLO does not have a

---

**1.** After Marilyn Klinghoffer's death, Ilsa Klinghoffer and Lisa Klinghoffer Arbitter, as co-executors of both Marilyn and Leon's estates, were substituted for Marilyn Klinghoffer as plaintiffs.

defined territory, it cannot have a permanent population.

The PLO is also unable to demonstrate that the State of Palestine is under the control of its own government. After all, without a defined territory, what, we ask, could the PLO possibly control? Moreover, even accepting the PLO's contention that the State of Palestine incorporates the West Bank, the Gaza Strip, and East Jerusalem, these areas are all under the control of the State of Israel, not the PLO.

Finally, despite the fact that some countries have "recognized" the PLO, the PLO does not have the capacity to enter into genuine formal relations with other nations. This is true primarily because, without a defined territory under unified governmental control, the PLO lacks the ability actually to implement the obligations that normally accompany formal participation in the international community. *See* Note, *The International Legal Implications of the November 1988 Palestinian Declaration of Statehood*, 25 Stan.J.Int'l L. 681, 696 (1989).

Contrary to the PLO's assertions, *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985), does not establish that the PLO is a sovereign nation entitled to immunity under the FSIA. In *Tel–Oren*, the D.C. Circuit affirmed the dismissal on jurisdictional grounds of a suit brought by Israeli citizens against persons allegedly responsible for an armed attack on a civilian bus in Israel.[2] Although each of the three judges in *Tel–Oren* agreed that the suit should be dismissed, they did so in three separate opinions, each with its own distinct reasoning. The PLO suggests that at least two of these opinions support the theory that the PLO is a state entitled to sovereign immunity. Nothing could be further from the truth. Judge Edwards, in his opinion, wrote that "the PLO is not a recognized member of the community of nations," *id.*

at 791, Judge Bork noted that the PLO "apparent[ly] lack[ed] ... international law status as a state," *id.* at 805, and Judge Robb concluded simply that the PLO "ought to remain an organization 'of whose existence we know nothing....,' " *id.* at 824 (quoting *United States v. Klintock*, 18 U.S. (5 Wheat.) 144, 149, 5 L.Ed. 55 (1820)). How the PLO reads these statements to support its claim to statehood we do not see.

The PLO also maintains that it is immune from suit as a result of its status as a permanent observer at the UN. It relies for this argument on the Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations (the "Headquarters Agreement"), *reprinted at* 22 U.S.C.A. § 287 Note. By its terms, however, the Headquarters Agreement extends immunity only to representatives of members of the UN, not to observers such as the PLO. *See id.* § 15. We see no reason to extend the immunities provided by the Headquarters Agreement beyond those explicitly stated.

Finally, the PLO claims that, because the United States has not extended it formal diplomatic recognition, it lacks the capacity to be sued in United States courts. This claim is without merit. While unrecognized regimes are generally precluded from appearing as plaintiffs in an official capacity without the Executive Branch's consent, *see Banco Nacional v. Sabbatino*, 376 U.S. 398, 410–11, 84 S.Ct. 923, 931, 11 L.Ed.2d 804 (1964); *National Petrochemical Co.*, 860 F.2d at 554–55, there is no bar to suit where an unrecognized regime is brought into court as a defendant. *Cf. United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir.1984) (contempt proceeding against attorney claiming to be representative of the "Republic of New Afrika," an unrecognized nation), *cert. denied*, 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 125 (1986). Accord-

**2.** Because the incident in *Tel–Oren* did not occur on the high seas, as did the hijacking here, admiralty was not an available basis of jurisdiction. Thus, the court had to decide whether the incident presented a federal question, or, in the alternative, whether jurisdiction could be asserted under 28 U.S.C. § 1350, which provides for jurisdiction over civil actions "by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

ingly, the fact that the United States has not recognized the PLO does not provide a basis for immunity.

### 2. Political Question

■ The PLO next argues that this case constitutes a non-justiciable political question because it "raises foreign policy questions and political questions in a volatile context lacking satisfactory criteria for judicial determination." Brief for Appellant at 27. This claim, it appears, rests on the concededly correct observation that the PLO is a political organization that engenders strong feelings of both support and ,opposition, and that any decision the district court enters will surely exacerbate the controversy surrounding the PLO's activities. However, the doctrine "is one of 'political questions,' not one of 'political cases.' " *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). The fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question.

In *Baker*, the Court wrote that:

[p]rominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* Although no one factor is dispositive, Justice Brennan, the author of *Baker*, has suggested that the first question—whether there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department"—is of particular importance. *See Goldwater v. Carter*, 444 U.S. 996, 1006, 100 S.Ct. 533, 538, 62 L.Ed.2d 428 (1979) (Brennan, J., dissenting) ("Properly understood, the political-question doctrine restrains courts from reviewing an exercise of foreign policy judgment by the coordinate political branch to which authority to make that judgment has been 'constitutional[ly] commit[ted].' "). Here, we are faced with an ordinary tort suit, alleging that the defendants breached a duty of care owed to the plaintiffs or their decedents. The department to whom this issue has been "constitutionally committed" is none other than our own—the Judiciary. This factor alone, then, strongly suggests that the political question doctrine does not apply.

All of the other factors identified in *Baker*, moreover, also militate against applying the political question doctrine here. First, because the common law of tort provides clear and well-settled rules on which the district court can easily rely, this case does not require the court to render a decision in the absence of "judicially discoverable and manageable standards." Second, because the PLO has maintained throughout this litigation that the hijacking was an act of piracy, rather than a terrorist act, a finding for or against the PLO does not depend on a prior political assessment about the value of terrorism, and thus no "initial policy decision of a kind clearly for nonjudicial discretion" need be made.[3] Third, given the fact that both the Executive and Legislative Branches have expressly endorsed the concept of suing terrorist organizations in federal court, *see* Letter from Abraham D. Sofaer, United States Department of State, Office of the Legal Adviser, to Justice Carmen B. Ciparick, (Sept. 4, 1986); 18

---

**3.** For this reason, the opinions of Judges Bork and Robb in *Tel–Oren, supra,* which suggested that judgments about the role of terrorism in international struggles are best entrusted to the Executive Branch, *see* 726 F.2d at 805 (Bork, J.); *id.* at 825–26 (Robb, J.), are inapplicable here.

In any event, given the Executive Branch's repeated condemnations of international terrorism, we believe that any initial policy decision that might conceivably be required has already been made.

U.S.C.A. § 2333(a) (West Supp.1990) (providing a civil remedy in federal court for United States nationals injured by acts of international terrorism), resolution of this matter will not exhibit "a lack of the respect due coordinate branches of government." Fourth, this case does not require us to display "unquestioning adherence to a political decision already made," because no prior political decisions are questioned—or even implicated—by the matter before us. Finally, because this lawsuit is consistent with both the Executive and Legislative Branch's attitude toward terrorists, resolution of this case does not have the potential for "embarrassment from multifarious pronouncements by various departments on one question."

Accordingly, we agree with the district court that the political question doctrine does not bar the claims presented here.

### 3. Personal Jurisdiction

The PLO next contends that its contacts with New York are insufficient to support an assertion of personal jurisdiction over it in the Southern District of New York.[4] For the reasons set forth below, we believe this claim cannot be resolved on the record before us, and we therefore remand to the district court for further findings of fact.

Based on the principles discussed by Judge Leisure in *Andros Compania Maritima S.A. v. Intertanker Ltd.*, 714 F.Supp.

669, 673–74 (S.D.N.Y.1989), as well as the natural implications of our opinion in *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963) (en banc), the law of the forum state—here, New York—governs the issue of personal jurisdiction in admiralty cases. Under the New York long-arm statute, the only plausible basis for jurisdiction over the PLO is section 301 of the New York Civil Practice Law and Rules ("CPLR"), which provides for general jurisdiction over defendant corporations that are "doing business" in New York.[5] *See Laufer v. Ostrow*, 55 N.Y.2d 305, 310–11, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (1982). The New York Court of Appeals has not yet decided whether the "doing business" rule applies to unincorporated associations. However, because "the form of organization by which a defendant does business is irrelevant to any policy governing acquisition of jurisdiction," 1 J. Weinstein, H. Korn & A. Miller, *New York Civil Practice*, ¶ 301.15, at 3–31, we see no reason to distinguish between corporate and non-corporate organizations in this regard. *Cf. Forgash v. Paley*, 659 F.Supp. 728, 730 (S.D.N.Y.1987) (Weinfeld, J.) (applying the "doing business" test to non-corporate, individual defendants). Accordingly, if the PLO meets the doing business standard, jurisdiction under section 301 would be appropriate.[6]

■ An organization is "doing business" under section 301 when it is engaged in

---

4. At the outset, we disagree with appellee Chandris that the PLO waived its right to contest personal jurisdiction by participating in discovery in these proceedings. First, we have no way of knowing whether Chandris is correct that the PLO participated in the depositions of plaintiffs Seymour and Viola Meskin on August 5 and 6, 1987, as Chandris has not included any documentary support for this claim—such as, for example, a deposition transcript—in the appellate record. In any event, even if the PLO did participate in those hearings, it did so before any complaints were filed against it. Thus, no assertion of jurisdiction had yet been made over it, and there was accordingly no jurisdictional defense that it could have waived.

5. Appellee Chandris suggests an alternative basis for jurisdiction—namely, that the PLO consented to jurisdiction in this case by participating in an unrelated lawsuit in state court. A party's consent to jurisdiction in one case, how-

ever, extends to that case alone. It in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given, where the party does not consent and no other jurisdictional basis is available.

6. In addressing this question ourselves, we reject appellee Chandris's claim that the decision in *United States v. PLO*, 695 F.Supp. 1456 (S.D. N.Y.1988), resolved the question whether the PLO meets the doing business standard of section 301. In *United States v. PLO*, the statute at issue created a federal, rather than a state, jurisdictional standard. *See id.* at 1461. Because the jurisdictional bases of New York law are more limited than those allowed under federal standards, *see* CPLR § 302, McLaughlin Practice Commentary, the fact that jurisdiction may have been appropriate under federal law does not establish that jurisdiction is now appropriate under CPLR § 301.

" 'such a continuous and systematic course' " of activity that it can be deemed to be "present" in the state of New York. *Laufer,* 55 N.Y.2d at 310–11, 449 N.Y.S.2d at 458, 434 N.E.2d at 694 (citations omitted). Whether this test is met depends on the aggregate of the organization's activities; the key question is whether "the quality and nature" of the defendant's contacts with New York "make it reasonable and just according to ' "traditional notions of fair play and substantial justice" ' that it be required to defend the action" in New York. 55 N.Y.2d at 311, 449 N.Y.S.2d at 458, 434 N.E.2d at 694 (citations omitted).

Here, the PLO has a number of contacts with the state of New York. It owns a building in Manhattan, which it uses as an office and residence for its employees, and it owns an automobile, maintains a bank account, and has a telephone listing in New York as well. In terms of its activities, it participates actively at the United Nations headquarters in Manhattan as a Permanent Observer, and its representatives have at times engaged in speaking tours and fundraising activities throughout the State. The question, then, is whether these activities amount to "doing business" within the meaning of section 301.

■ The district court concluded that all of the above activities, when viewed as a whole, indicate that the PLO is engaged in business in New York State. *See* 739 F.Supp. at 863. This analysis, however, fails to distinguish those activities the PLO conducts as an observer at the UN from those activities it conducts for other purposes. In our view, only those activities not conducted in furtherance of the PLO's observer status may properly be considered as a basis of jurisdiction.

We reach this conclusion for two reasons. First, were the PLO not a permanent observer at the UN, it would not be entitled to enter New York at all. *See*

*United States v. PLO,* 695 F.Supp. 1456, 1471 (S.D.N.Y.1988) (finding that, pursuant to the ATA, the PLO is prohibited from engaging in any activities in this country other than the maintenance of a mission to the UN). It is allowed to come to New York only because the Headquarters Agreement effectively removes control over the UN Headquarters and related areas from the jurisdiction of the United States. In other words, the PLO's participation in the UN is dependent on the legal fiction that the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control. For a federal court then to turn around and conclude that the PLO has been doing business in New York as a result of its UN activities would, we believe, be rather duplicitous.

Second, and more importantly, basing jurisdiction on the PLO's participation in UN-related activities would put an undue burden on the ability of foreign organizations to participate in the UN's affairs. In an analogous context, courts have held that jurisdiction in the District of Columbia may not be grounded on a non-resident's "getting information from or giving information to the government, or getting the government's permission to do something." *Investment Co. Inst. v. United States,* 550 F.Supp. 1213, 1216–17 (D.D.C.1982). Although this "government contacts" rule is based in part on the constitutional right "to petition the Government for redress of grievances," *see Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 786–87 (D.C. Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984)—a right not implicated here—it also appears to be based on non-constitutional policy considerations, such as the Judiciary's reluctance to interfere with the smooth functioning of other governmental entities.[7] As appellees conceded at oral argument, these same con-

7. The use of jurisdictional immunities to further non-constitutional policy goals is not limited to the context of government lobbying. *See, e.g., Stewart v. Ramsay,* 242 U.S. 128, 37 S.Ct. 44, 61 L.Ed. 192 (1916) (holding that service of process may not be executed on a non-resident who comes into the jurisdiction to participate in liti-

gation as a plaintiff, defendant, or witness); *Shapiro & Son Curtain Corp. v. Glass,* 348 F.2d 460 (2d Cir.) (exempting witnesses who appear in judicial proceedings from service of process), *cert. denied,* 382 U.S. 942, 86 S.Ct. 397, 15 L.Ed.2d 351 (1965).

cerns militate against basing jurisdiction over the PLO on its UN-related activities. Accordingly, we conclude that jurisdiction may be asserted over the PLO only if its non-UN related activities rise to the level of doing business under section 301.

With regard to the PLO's non-UN activities, Judge Stanton noted that "[e]very month or two, Mr. Terzi speaks in public and to the media in New York in support of the PLO's cause," 739 F.Supp. at 863, and appellees have pointed to a number of other proselytizing and fundraising activities the PLO has undertaken. Taken together, we believe these activities would suffice to meet the doing business standard. However, the evidence in the record concerning the PLO's non-UN activities is limited to deposition testimony taken before the end of 1987,[8] when Congress passed the ATA. In light of the ATA, it is quite possible that the PLO was forced to cease its non-UN activities in New York some time after 1987. Thus, because personal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed, *see* 4 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1051, at 160–62 (1987), personal jurisdiction over the PLO may be lacking with respect to those complaints that were filed after 1987.[9]

Accordingly, on remand, the court should determine whether the PLO's non-UN-related contacts with New York provided a sufficient basis for jurisdiction at the time each of the complaints was filed. In conducting this analysis, it should pay careful attention to those complaints filed after 1987, and determine whether the PLO continued in its fundraising and proselytizing activities after the ATA was passed.

### 4. Service of Process

Even if the court concludes on remand that personal jurisdiction may be asserted over the PLO with respect to some or all of the complaints, the question remains as to whether service of process on the PLO's Permanent Observer to the UN was sufficient. For the reasons set forth below, we believe further findings are required before the district court can resolve this question conclusively.

Although its arguments on this point are somewhat muddled, it appears that the PLO's service of process argument essentially breaks down to two distinct claims. The first claim is that the law of the forum state determines the procedure for suing an unincorporated association such as the PLO, and that, because New York law provides that unincorporated associations can be sued only by naming (and accordingly serving) the president or treasurer personally, service on the PLO's Permanent Observer was insufficient.[10] *See* N.Y.Gen. Ass'ns Law § 13 (McKinney Supp.1991).

---

8. The only indication in the record that the PLO has engaged in fundraising and propaganda activities comes from the depositions of Mr. Terzi, taken on March 31, 1986, and Hasan Abdul–Rahman, taken on October 6, 1987.

9. This conclusion is not affected by the Supreme Court's recent decision in *Freeport–McMoRan, Inc. v. K N Energy, Inc.,* — U.S. —, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991) (per curiam), which held that diversity jurisdiction, once established, is not defeated by the addition of a non-diverse party to the action. In *Freeport,* the Court concluded that the addition of a non-diverse party to the *original complaint* does not destroy diversity, on the theory that, "if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." 111 S.Ct. at 860. This holding is inapplicable to the present case for two reasons. First, it relates only to the question of subject matter jurisdiction, and says nothing about the question of personal jurisdic-

tion with which the present controversy is concerned. Second, the third-party complaints and the two direct suits filed against the PLO were not simply additions to the original complaint, as was the amendment to the complaint in *Freeport,* but were new actions entirely. As such, defects in personal jurisdiction as to those new complaints cannot be overcome by the fact that personal jurisdiction over the PLO may have existed at the time the first complaint was filed.

10. We state that the PLO's arguments are muddled because, at times, it appears that its claim is simply that the parties failed to comply with New York's requirement of *naming* the President and Treasurer, rather than the requirement of *serving* the President and Treasurer personally. To the extent the claim is, in fact, that the requirement of naming the President and Treasurer was not met, however, it is undermined by the complaints' reference to "John Doe as President and Richard Roe as Treasurer."

The second claim is that, even if New York law does not apply, and suing the PLO in its common name is sufficient, service of process on the Permanent Observer was deficient under federal standards.

█ Our first task is to determine whether New York law is controlling on this issue, or whether a federal standard is to govern. Under Rule 17(b) of the Federal Rules of Civil Procedure, the law of the forum state determines the manner in which an unincorporated association must be sued, except where the complaint alleges violations of "substantive right[s] existing under the Constitution or laws of the United States," in which case federal law governs. Thus, if the claims asserted here are non-federal causes of action, the complaints would have to comport with the law of New York, which, as noted above, would require naming and serving the PLO's president or treasurer. *See* N.Y.Gen. Ass'ns Law § 13. If they are federal claims, however, naming the PLO in its common name and delivering service of process to its managing or general agent would suffice. *See Oyler v. National Guard Ass'n,* 743 F.2d 545, 550 (7th Cir. 1984). At the outset, then, we must determine whether the complaints raise federal or non-federal law claims.

The district court concluded that the claims in this case are federal, because "federal maritime law applies." *See* 739 F.Supp. at 865–66. However, the court did not engage in a choice of law analysis, and itself noted that, "at this point[,] it is not clear which [jurisdiction's] law will apply." *Id.* at 866. As such, although it stated that federal maritime *law* applies, what it probably meant to say was that the case was brought under the admiralty and maritime *jurisdiction* of the federal courts. An assertion of admiralty jurisdiction, however, does not mean that the underlying claims raise "substantive right[s] existing under the Constitution or laws of the United States" within the meaning of Rule 17(b). *Cf. Romero v. International Terminal Operating Co.,* 358 U.S. 354, 368, 79 S.Ct. 468, 478, 3 L.Ed.2d 368 (1959) (holding that maritime cases not involving federal statutes do not arise under the laws of the United States for purposes of federal question jurisdiction). Rather, under *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), another nation's contacts with a particular event may be so great as to warrant the application of the law of that nation, even if jurisdiction has properly been asserted in federal court on the basis of admiralty. *See Bilyk v. Vessel Nair,* 754 F.2d 1541, 1543–45 (9th Cir.1985) (applying *Lauritzen* ).

Indeed, the district court was fully aware that, under *Lauritzen,* Italian law might ultimately be found to apply on the facts of this case. *See* 739 F.Supp. at 866. However, it concluded that "[i]f . . . foreign law applies, it will be because federal law requires its use," *id.,* and that, as a result, the complaints would remain federal for purposes of Rule 17(b). This analysis, we believe, confuses federal *choice* of foreign law with federal *incorporation* of state and foreign law rules. In the latter situation, a federal court that has the power to create a federal rule of decision may choose to exercise that power by incorporating legal principles derived from state or foreign law. *See, e.g., United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979); *Barkanic v. General Admin. of Civil Aviation,* 923 F.2d 957, 961 (2d Cir.1991). When state or foreign law is used in this sense, it becomes a federal rule for all practical purposes; for example, it is binding on state courts under the Supremacy Clause. *See* Field, *Sources of Law: The Scope of Federal Common Law,* 99 Harv. L.Rev. 881, 963–64 (1986). By contrast, where a federal court concludes that another jurisdiction has the greatest interest in regulating a particular situation, it applies that law outright—indeed, it may be constitutionally prohibited from applying another jurisdiction's law to the case. *See Allstate Ins. Co. v. Hague,* 449 U.S. 302, 310–13, 101 S.Ct. 633, 638–40, 66 L.Ed.2d 521 (1981) (concluding that courts may not apply the law of jurisdictions that lack significant contacts with the case); P. Bator, D. Meltzer, P. Mishkin & D. Shapiro, *Hart & Wechsler's The Federal Courts and the*

*Federal System* 798–99 (3d ed. 1988) (noting that *Hague* applies to federal courts). Under these circumstances, the foreign rule does not simply give content to what is essentially a federal substantive right, but rather applies of its own force. Thus, it does not assume the status of federal law.

Accordingly, if the district court concludes that *Lauritzen* requires it to apply Italian law to this case, no federal right would be involved, and Rule 17(b) would require the application of New York law with respect to the method of bringing suit against an unincorporated association. Thus, because New York law mandates serving the PLO's president or treasurer, service of process on the Permanent Observer would be inadequate, and the complaints would have to be dismissed.[11]

If, however, the court determines that United States maritime law governs, naming the PLO in its common name would be sufficient, and service could then be made on the PLO's "managing or general agent." Fed.R.Civ.P. 4(d)(3). Under those circumstances, the only issue would be whether the PLO's Permanent Observer to the UN constitutes a managing or general agent within the meaning of Rule 4(d)(3). In our view, the evidence in the record indicates that the Permanent Observer's functions in New York are comparable to those of a general agent. Accordingly, in the event the district court concludes that United States law governs, a dismissal on service of process grounds would be unwarranted.

Vacated and remanded, with instructions to determine whether personal jurisdiction can be asserted over the PLO with respect to some or all of the complaints at issue here, and, if so, whether service of process on the PLO's Permanent Observer to the UN was sufficient.

---

**11.** Such a dismissal, of course, would be without prejudice. *See* 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1353, at 285–86 (1990).