# IN THE SUPREME COURT OF IOWA

No. 13–0723

Filed June 13, 2014

**LAURIE FREEMAN, SHARON MOCKMORE, BECCY BOYSEL, GARY D. BOYSEL, LINDA L. GOREHAM, GARY R. GOREHAM, KELCEY BRACKETT,** and **BOBBIE LYNN WEATHERMAN,**

> Appellants,

vs.

**GRAIN PROCESSING CORPORATION,**

> Appellee.

---

Appeal from the Iowa District Court for Muscatine County, Mark J. Smith, Judge.

Appellants assert the district court improperly granted summary judgment. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Sarah E. Siskind, Barry J. Blonien and David Baltmanis of Miner, Barnhill & Galland, P.C., Madison, Wisconsin, Andrew L. Hope of Hope Law Firm, P.L.C., West Des Moines, James C. Larew and Claire M. Diallo of Larew Law Office, Iowa City, for appellants.

Michael R. Reck, Mark McCormick, Charles F. Becker, Kelsey J. Knowles of Belin McCormick, P.C., Des Moines, Steven J. Havercamp and Eric M. Knoernschild of Stanley, Lande & Hunter, P.C., Muscatine, Joshua B. Frank and Charles A. Loughlin of Baker Botts L.L.P., Washington, D.C., for appellee.

Joshua T. Mandelbaum, Des Moines, and Howard A. Learner, Chicago, Illinois, for amici curiae Environmental Law & Policy Center and Iowa Environmental Council.

Ronald A. May of Gomez, May LLP, Davenport, James L. Huffman, Portland, Oregon, Scott A. Shepard, Chicago, Illinois, Roger E. Meiners, Arlington, Texas, and Andrew Morriss, Tuscaloosa, Alabama, for amicus curiae Property and Environment Research Center.

Sarah E. Crane of Davis Brown Law Firm, Des Moines, and Richard O. Faulk of Hollingsworth LLP, Washington, D.C., for amici curiae National Association of Manufacturers, Council of Industrial Boiler Owners, National Shooting Sports Foundation, Inc., National Mining Association, Nuclear Energy Institute, Inc., and Textile Rental Services Association of America.

**APPEL, Justice.**

Eight residents of Muscatine filed a lawsuit[1] on behalf of themselves and other similarly situated Muscatine residents against Grain Processing Corporation (GPC), which operates a local corn wet milling facility. The residents claim the operations at GPC's facility cause harmful pollutants and noxious odors to invade their land, thereby diminishing the full use and enjoyment of their properties. They base their claims on common law and statutory nuisance as well as the common law torts of trespass and negligence. The residents seek certification of the lawsuit as a class action, damages for the lost use and enjoyment of their properties, punitive damages, and injunctive relief.

Prior to class certification, GPC moved for summary judgment. GPC asserted the residents' common law and statutory claims were preempted by the Federal Clean Air Act (CAA), 42 U.S.C. §§ 7401–7671q (2012). In the alternative, GPC claimed the common law claims were preempted by Iowa Code chapter 455B (2013), which is the state statutory companion to the CAA. Finally, GPC argued the issues raised by the residents amounted to political questions involving complex policy and economic issues that cannot and should not be resolved by the judicial process.

The district court granted summary judgment in favor of GPC on all three theories and dismissed the lawsuit. The residents appeal. For the reasons expressed below, we reverse the judgment of the district court and remand the case for further proceedings.

---

[1]Plaintiffs filed an "Amended Class Action Petition" on March 19, 2013, which will hereinafter be referred to as the petition.

## I. Factual and Procedural Background.

The eight individually named plaintiffs all reside within one and one-half miles of GPC's facility in Muscatine. They seek to represent a class described as follows: "All Muscatine residents (other than Defendant and its affiliates, parents, or subsidiaries) who have resided during the damages period within 1.5 [miles] of the perimeter of Defendant's facility located at 1600 Oregon St., Muscatine, Muscatine County, Iowa."

According to the petition, GPC conducts corn wet milling operations at its Muscatine facility. The plaintiffs assert wet milling is a production method and process that transforms corn kernels into products for commercial and industrial use. The plaintiffs allege the corn wet milling operation at GPC's facility creates hazardous by-products and harmful chemicals, many of which are released directly into the atmosphere. The plaintiffs allege these by-products include: particulate matter, volatile organic compounds including acetaldehyde and other aldehydes, sulfur dioxide, starch, and hydrochloric acid. They assert the polluting chemicals and particles are blown from the facility onto nearby properties. They note particulate matter is visible on properties, yards, and grounds and various chemical pollutants are also present. Compounding these adverse effects, according to the plaintiffs, GPC has used, continues to use, and has failed to replace its worn and outdated technology with available technology that would eliminate or drastically reduce the pollution. The plaintiffs assert these emissions have caused them to suffer persistent irritations, discomforts, annoyances, inconveniences, and put them at risk for serious health effects.

The plaintiffs generally allege three claims against GPC: nuisance, negligence, and trespass. With regard to the nuisance claim, the plaintiffs contend GPC's use of its facility constitutes a nuisance under the common law and Iowa Code chapter 657, which provides a statutory framework for nuisance claims. They assert that GPC has operated its facility in a manner that unreasonably interferes with the reasonable use and enjoyment of their properties.

The plaintiffs also assert they have been harmed by GPC's negligence. They claim GPC failed to exercise reasonable care in its operations by causing or permitting hazardous substances to be released at the facility; failing to follow accepted industry standards with respect to maintaining its operation; failing to exercise reasonable and prudent care in their operations; and failing to implement, follow, and enforce proper operations and safety procedures. The plaintiffs further rely on res ipsa loquitor, arguing the release of the toxic substances would not ordinarily occur in the absence of GPC's negligence, and, the acts or omissions of the equipment and personnel that led to the toxic releases were under GPC's control at all relevant times.

Finally, the plaintiffs claim GPC's operations constitute a past and continuing trespass. They allege GPC, intentionally, purposefully, or with substantial knowledge that harm would result, contacted the properties of the plaintiffs and the class without their consent, resulting in the lost use and enjoyment of their properties. The plaintiffs assert GPC's contact with their properties constitutes a tortious physical intrusion on their properties.

GPC sought to bring an end to the litigation by filing a motion for summary judgment. First, GPC claimed the CAA's comprehensive regulatory framework preempted the plaintiffs' causes of action. Second,

GPC claimed Iowa Code chapter 455B, which regulates emissions, preempted the plaintiffs' claims. Finally, GPC asserted the case presented a nonjusticiable political question because a lawsuit impacting facility emissions lacks judicially discoverable and manageable standards for resolving the issues.

Resisting the motion for summary judgment, the plaintiffs emphasized that under the CAA, states are allowed to impose stricter standards than those imposed by federal law. The plaintiffs noted nothing in the language of Iowa Code chapter 455B repealed chapter 657 related to nuisance claims and, in any event, their common law claims were not inconsistent or irreconcilable with chapter 455B. Finally, the plaintiffs asserted courts routinely hear complex nuisance, negligence, and trespass cases and, as a result, there was no basis in the federal political question doctrine to decline to hear the case.

The district court first considered whether the CAA preempted the plaintiffs' claims and concluded the CAA established a comprehensive regulatory scheme that displaced state law. In reaching this result, the district court noted that in *American Electric Power Co. v. Connecticut* (*AEP*), the United States Supreme Court held the CAA displaced "any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants." 564 U.S. ___, ___, 131 S. Ct. 2527, 2537, 180 L. Ed. 2d 435, 447 (2011). While the district court recognized the *AEP* Court did not consider the question of whether the CAA preempted state law claims, the district court cited lower federal court authority concluding the CAA also preempted state law claims. *See Bell v. Cheswick Generating Station* (*Bell I*), 903 F. Supp. 2d 314, 315–16, 322 (W.D. Pa. 2012) (concluding the CAA preempted state common law nuisance, negligence, trespass, and strict liability claims), *rev'd* 734 F.3d

188, 190 (3d Cir. 2013);[2] *Comer v. Murphy Oil USA, Inc.* (*Comer I*), 839 F. Supp. 2d 849, 865 (S.D. Miss. 2012) (extending the reasoning of *AEP* to state law claims after characterizing them as turning on the reasonableness of emissions, a determination entrusted to Congress); *United States v. EME Homer City Generation L.P.*, 823 F. Supp. 2d 274, 297 (W.D. Pa. 2011) (holding the CAA is a comprehensive regulatory scheme that preempted a common law public nuisance claim).

Adopting the reasoning of these authorities, the district court noted Congress had entrusted to the EPA and parallel state agencies the authority to regulate air emissions, and the CAA had established a method of citizen input in its rulemaking process. The district court held that to have a jury make a judgment about the reasonableness of GPC's emissions would invade the authority Congress vested in the EPA and state environmental authorities. The district court further noted GPC was already the subject of an enforcement action by state regulators under the CAA and that the plaintiffs' actions in this case would conflict with these enforcement procedures.

For largely the same reasons, the district court concluded state environmental statutes and regulations under Iowa Code chapter 455B preempted the plaintiffs' common law claims. The district court reasoned that controversies related to air emissions were to be determined by state regulators, not by judges and juries in common law actions.

Finally, the district court also agreed with GPC's position that the questions raised in the litigation amounted to political questions not

---

[2]The Third Circuit heard the appeal after the district court ruled on the motion for summary judgment in this case.

amenable to resolution by the judiciary in a lawsuit. Citing *Comer I*, the district court noted a court or jury lacks judicially discoverable and manageable standards for resolving the complex environmental issues and would be forced to make policy determinations weighing the costs and benefits of GPC's facility to the surrounding community. *See* 839 F. Supp. 2d at 864 ("It is unclear how this Court or any jury, regardless of its level of sophistication, could determine whether the defendants' emissions unreasonably endanger the environment or the public without making policy determinations that weigh the harm caused by the defendants' actions against the benefits of the products they produce.").

This court retained the plaintiffs' appeal.

## II. Standard of Review.

The standard of review for rulings on motions for summary judgment is for correction of legal errors. *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007). The standard applies when the material facts are not disputed or the appeal turns on questions of statutory interpretation. *See State v. Spencer*, 737 N.W.2d 124, 128 (Iowa 2007); *Krause v. Krause*, 589 N.W.2d 721, 724 (Iowa 1999).

## III. Discussion of Preemption Under the CAA.

## A. Overview of Common Law and Statutory Approaches to Environmental Protection.

1. *Introduction.* In the law, as in life, in order to know where you are, you need to know where you have been. We therefore begin our discussion of the issues posed in this case with an overview of the law of environmental protection. This background will give us a better understanding of the historical and legal context in which the issues in this case arise. In particular, the historical and legal context will shed

light on the degree to which the passage of the CAA impacts the traditional role of state law in environmental regulation.

2. *Traditional remedies for environmental harm: the common law.* The common law provided the first means of attempting to control environmental pollution. Tort claims challenging environmental pollution can be traced back to at least the seventeenth century to *William Aldred's Case*, (1611) 77 Eng. Rep. 816, 9 Co. Rep. 57a (K.B.), where the court held odor from the defendant's hog lot was a nuisance. *See* 1 John H. Wigmore, *Select Cases on the Law of Torts* 569–71 (1912); Jason J. Czarnezki & Mark L. Thomsen, *Advancing the Rebirth of Environmental Common Law*, 34 B.C. Envtl. Aff. L. Rev. 1, 3 & n.14 (2007) [hereinafter Czarnezki]. Despite its ancient origin, most American environmental caselaw dates to the late nineteenth and twentieth centuries after the Industrial Revolution. *See* Czarnezki, 34 B.C. Envtl. Aff. L. Rev. at 3.

The primary common law theories seeking redress for environmental harms were nuisance,[3] negligence, trespass, and strict liability. *See* 1 Linda A. Malone, *Environmental Regulation of Land Use* § 10:2, at 10-7, 10-8.1 (2013) [hereinafter Malone]. In the United States, many pollution cases invoking these common law theories have been brought over the years, with mixed results. *See, e.g., id.* § 10:2, at 10-9 n.8, 10-12 n.19 (collecting cases involving trespasses committed in the

---

[3]The common law distinguishes between private and public nuisances. *See* Czarnezki, 34 B.C. Envtl. Aff. L. Rev. at 4. A private nuisance is a tort arising from the unreasonable "invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts § 821D, at 100 (1979). A public nuisance arises from "an unreasonable interference" with a public right. *Id.* § 821B(1), at 87. A public nuisance does not necessarily involve interference with the use and enjoyment of land. *Id.* § 821B cmt. *h,* at 93.

air space above land and nuisance cases involving odors in the air and smoke, dust, or gas emissions). *See generally* Andrew Jackson Heimert, *Keeping Pigs Out of Parlors: Using Nuisance Law to Affect the Location of Pollution*, 27 Envtl. L. 403, 406–08 & n.7 (1997) (providing a brief history of nuisance actions from as early as the twelfth century to the early twentieth century); Julian Conrad Juergensmeyer, *Control of Air Pollution Through the Assertion of Private Rights*, 1967 Duke L.J. 1126, 1130–48 (1967) (summarizing cases involving trespass, negligence, and nuisance claims in the air pollution context); Harold W. Kennedy and Andrew G. Porter, *Air Pollution: Its Control and Abatement*, 8 Vand. L. Rev. 854, 854–64 (1954–1955) (citing numerous common law cases seeking remedies in the context of air pollution); Roger Meiners & Bruce Yandle, *Common Law and the Conceit of Modern Environmental Policy*, 7 Geo. Mason L. Rev. 923, 926–46 (1999) (giving overview of common law tradition and identifying nuisance as the "backbone" of common law environmental litigation). The availability of nuisance theory to address environmental harms was endorsed by the Restatement (Second) of Torts, which includes sections on both public nuisance and private nuisance. *See* Restatement (Second) of Torts §§ 821B–821E, at 87–104. According to one commentator, nuisance theory "has hung on from its horse-and-buggy origins" and "continues to be the fulcrum of what is called today environmental law." 1 William H. Rodgers, Jr., *Environmental Law: Air and Water* § 1.1, at 3 (1986); *id.* § 2.1, at 29.

Nuisance theory has been recognized in Iowa for decades and has been utilized to address environmental problems. *See, e.g., Kriener v. Turkey Valley Cmty. Sch. Dist.*, 212 N.W.2d 526, 535–36 (Iowa 1973) (noxious odor from sewage facility amounts to private nuisance); *Ryan v. City of Emmetsburg*, 232 Iowa 600, 601–03, 4 N.W.2d 435, 437–38 (1942)

(private nuisance arising from sewer system). *See generally* Ronald Sorenson, *The Law of Nuisance in Iowa,* 12 Drake L. Rev. 107 (1962– 1963). For instance, in *Bowman v. Humphrey,* the plaintiff landowner successfully sued a creamery on a nuisance theory for depositing refuse in a running stream that injured the lower riparian owner. 132 Iowa 234, 235–36, 243, 109 N.W. 714, 714–15, 717 (1906). Similarly, in *Higgins v. Decorah Produce Co.,* plaintiffs successfully claimed that a poultry and produce plant was a nuisance and obtained a court order that certain sanitary measures be taken to reduce the odor. 214 Iowa 276, 283–84, 242 N.W. 109, 112–13 (1932).

In addition to common law nuisance, the Iowa legislature has enacted a statutory nuisance claim in Iowa Code chapter 657. *See* Iowa Code § 657.1. We have long held that the statutory nuisance provisions of Iowa Code chapter 657 do not modify the common law of nuisance but supplement it. *See, e.g., Miller v. Rohling,* 720 N.W.2d 562, 567 (Iowa 2006); *Perkins v. Madison Cnty. Livestock & Fair Ass'n,* 613 N.W.2d 264, 271 (Iowa 2000); *Bates v. Quality Ready-Mix Co.,* 261 Iowa 696, 703, 154 N.W.2d 852, 857 (1967).

In addition to nuisance claims, parties seeking redress for environmental harms have also pleaded common law claims of negligence and trespass. *See* Malone § 10:2, at 10-7, 10-8.1. Negligence claims ordinarily require conduct that falls below a standard of care established for others against unreasonable risk of harm. *Id.* § 10:2, at 10-8.1; *see also Sterling v. Velsicol Chem. Corp.,* 647 F. Supp. 303, 316– 17 (W.D. Tenn. 1986) (involving common law negligence claim in connection with closure of chemical waste burial site), *aff'd in part, rev'd in part,* 855 F.2d 1188 (6th Cir. 1988); *Patrick v. Sharon Steel Corp.,* 549 F. Supp. 1259, 1261, 1269 (N.D. W. Va. 1982) (holding negligence claim

arising from air pollution raises question of fact for jury); *Conrad v. Bd. of Supervisors*, 199 N.W.2d 139, 140 (Iowa 1972) (involving negligence claim arising from pollution of a farm pond); *Bloodgood v. Organic Techs. Corp.*, No. 99–0755, 2001 WL 98656, at *1 (Iowa Ct. App. Feb. 7, 2001) (involving negligence claim, inter alia, arising from operation of a compost facility); *Schlichtkrull v. Mellon-Pollock Oil Co.*, 152 A. 832, 832 (Pa. 1930) (involving negligence claim arising from injuries resulting from pollution of house well).

Trespass ordinarily requires a showing of actual interference with a party's exclusive possession of land including some observable or physical invasion. *See Ryan*, 232 Iowa at 603, 4 N.W.2d at 438 (noting distinction between trespass and nuisance); *see also Borland v. Sanders Lead Co.*, 369 So. 2d 523, 525 (Ala. 1979) (trespass involving lead particulates and sulfoxide deposits); *Lunda v. Matthews*, 613 P.2d 63, 65–66 (Or. Ct. App. 1980) (trespass caused by dust); *Bradley v. Am. Smelting & Ref. Co.*, 709 P.2d 782, 784, 792 (Wash. 1985) (holding intentional deposit of microscopic particulates from copper smelter could give rise to trespass claim). Perhaps the most cited, relatively recent, trespass cases in the air pollution context arise from fluoride emissions in Washington and Oregon. *See generally Lampert v. Reynolds Metals Co.*, 372 F.2d 245 (9th Cir. 1967); *Reynolds Metals Co. v. Lambert*, 316 F.2d 272, *rev'd in part* 324 F.2d 465 (9th Cir. 1963); *Arvidson v. Reynolds Metals Co.*, 236 F.2d 224 (9th Cir. 1956); *Fairview Farms, Inc. v. Reynolds Metals Co.*, 176 F. Supp. 178 (D. Or. 1959); *Martin v. Reynolds Metals Co.*, 342 P.2d 790, 791 (Or. 1959).

As with nuisance claims, these common law causes of action have a deep legal tradition that find their roots well into the past and extend to the present day. *See* Patrick J. Kelley, *Restating Duty, Breach, and*

*Proximate Cause in Negligence Law: Descriptive Theory and the Rule of Law*, 54 Vand. L. Rev. 1039, 1056–63 (2001); George E. Woodbine, *The Origins of the Action of Trespass*, 34 Yale L.J. 343, 343–44 (1925); George E. Woodbine, *The Origins of the Action of Trespass*, 33 Yale L.J. 799, 799–800 (1924).

3. *Advent of the "age of statutes."*[4]  While state common law actions to address environmental problems may be well-established, reliance solely on common law to control pollution proved inadequate. Because the common law only settled disputes on a case-by-case basis, coverage was hit and miss.  Further, bringing common law actions was expensive, and many potential plaintiffs simply could not afford to bring actions against well-heeled defendants.  In addition, requirements of standing, causation, and proof of damages often made success in common law actions difficult.  *See* Malone § 10:2, at 10-19.  Finally, the 1960s and 1970s saw dramatic increases in the amount and extent of pollution.  Through broadcast television, viewers watched as the Cuyahoga River caught fire, acid rain poured on the Northeast region, and many American cities experienced severe smog.  *See* Lowell E. Baier, *Reforming the Equal Access to Justice Act*, 38 J. Legis. 1, 12–13 (2012) (describing "[e]nvironmental disasters in the 1960's and 1970's . . . [that] gave rise to . . . environmentalism").

As a result, the 1960s and 1970s saw the development of significant statutory approaches to pollution.  *See* Arnold W. Reitze, Jr., *The Legislative History of U.S. Air Pollution Control*, 36 Hous. L. Rev. 679, 696–711 (1999) [hereinafter Reitze].  The CAA was originally enacted in 1963.  *Id.* at 698.  It has since been substantially amended numerous

---

[4]*See generally* Guido Calabresi, *A Common Law for the Age of Statutes* (1982).

times.  *See* Arnold W. Reitze Jr., *A Century of Air Pollution Control Law: What's Worked; What's Failed; What Might Work*, 21 Envtl. L. 1549, 1588–1612 (1991); Reitze, 36 Hous. L. Rev. at 699, 702–29.

Each subsequent amendment increased the scope and complexity of the effort to control air pollution.  *See* Reitze, 36 Hous. L. Rev. at 699–729.  In particular, in 1990 Congress enacted major amendments to the CAA.  *See* Craig N. Oren, *The Clean Air Act Amendments of 1990:  A Bridge to the Future?*, 21 Envtl. L. 1817, 1817, 1828, 1832 (1991).  As noted by one commentator, since 1970, "the EPA has created a vast regulatory structure to control the emission of air pollutants, including technological standards, health standards, risk levels, and enforcement provisions, completely transforming what was once the province of state law."  Alexandra B. Klass, *State Innovation and Preemption:  Lessons from State Climate Change Efforts*, 41 Loy. L.A. L. Rev. 1653, 1686 (2008).

The CAA is undoubtedly complex.  By way of general overview, the CAA embraces what has been called a "cooperative federalism" model.  *See Bell v. Cheswick Generating Station (Bell II)*, 734 F.3d 188, 190 (3d Cir. 2013) ("[The CAA] employs a 'cooperative federalism' structure under which the federal government develops baseline standards that the states individually implement and enforce.").  With respect to ambient air quality, the CAA directs the EPA to set national ambient air quality standards (NAAQS) for pollutants in ambient air considered harmful to the public health and welfare.  *See* 42 U.S.C. § 7409(a)–(b).  The NAAQS are further divided into primary NAAQS and secondary NAAQS.  *Id.* § 7409(b).  The primary NAAQS are intended to protect public health, while the secondary NAAQS are intended to protect the surrounding environment.  *Id.*  They are often, though not always, the same.  *See, e.g.,* 40 C.F.R. pt. 50 (2013); U.S. Envtl. Prot. Agency, *National Ambient*

*Air Quality Standards (NAAQS),* http://www.epa.gov/air/criteria.html (last updated Dec. 14, 2012) (chart detailing primary and secondary NAAQS levels). States are required to develop state implementation plan(s) (SIP) that employ pollution reduction methods to meet the NAAQS. *Id.* § 7410(a)(1). The states, however, are free to adopt more stringent requirements if they choose to do so. *Id.* § 7416. Each state's SIP must include a mandatory permitting program for all stationary sources limiting the amounts and types of emissions each source is allowed to discharge. *Id.* § 7661a(d)(1). Before new construction or modifications may be made to a source of emissions, the SIP must provide for "written notice to all nearby States the air pollutions levels of which may be affected by such source at least sixty days prior to the date on which commencement of construction is to be permitted." *Id.* § 7426(a)(1)(B). *See generally North Carolina ex rel. Cooper v. Tenn. Valley Auth.* (*TVA*), 615 F.3d 291, 299–300 (4th Cir. 2010) (providing overview of the CAA's management of emissions through NAAQS, SIP, permit programs, and 42 U.S.C. § 7426(a)(1)); *Her Majesty the Queen v. City of Detroit,* 874 F.2d 332, 335 (6th Cir. 1989) (describing basic requirements for SIP, including permit programs).

4. *Differences between common law and regulatory regimes.* The CAA and Iowa Code chapter 455B address the overall quality of air that we all breathe and provide a regulatory framework focused on prevention of pollution through emissions standards designed to protect the general public. While civil money penalties may be imposed for violations of the CAA, the CAA does not provide damage remedies to harmed individuals. *See* 42 U.S.C. § 7604. In contrast, the common law focuses on special harms to property owners caused by pollution at a specific location. *See* Alice Kaswan, *The Domestic Response to Global Climate Change: What*

*Role for Federal, State, and Litigation Initiatives?*, 42 U.S.F. L. Rev. 39, 102–03 (2007). As a result, through common law actions, victims may obtain compensatory damages, punitive damages, and injunctive relief. *See id.* In sum, statutes deal with general emissions standards to prospectively protect the public, while common law actions retrospectively focus on individual tort remedies for owners of real property in particular locations for actual harms. As noted by commentators:

> [C]ommon law controls are based on property rights, are location specific, and provide remedies to rightholders for real harms. Federal regulation, on the other hand, is all encompassing, provides no specific protection to rightholders, and offers no remedies for damages that rightholders may sustain . . . [t]he two approaches are truly different and therefore, cannot be compared as though they were quite similar.

Roger E. Meiners, Stacie Thomas, & Bruce Yandle, *Burning Rivers, Common Law, and Institutional Choice for Water Quality*, *in The Common Law and the Environment: Rethinking the Statutory Basis for Modern Environmental Law* 54, 78 (Roger E. Meiners & Andrew P. Morriss eds., 2000); *see also* 6 Frank P. Grad, *Treatise on Environmental Law* § 18.02, at 18-5 (2001) [hereinafter Grad] ("A rather clear division of labor has developed between litigation to protect the public interest under federal and state statutory law, and the protection of individual, private interests through common law, frequently tort actions."); Daniel P. Selmi & Kenneth A. Manaster, *State Environmental Law* § 2:2, at 2-12 to 2-13 (2012) [hereinafter Selmi] (noting that even citizen suits under environmental statutes do not ordinarily provide a damage remedy and that injunctive relief in common law actions can take into account specific facts of the case).

The differences in the statutory and common law regimes are demonstrated by what must be shown to establish a violation. A party seeking to establish a violation of the statutory regime does not need to demonstrate the presence of a nuisance. *See, e.g., Pottawattamie County v. Iowa Dep't of Envtl. Quality*, 272 N.W.2d 448, 454 (Iowa 1978) (holding violation of fugitive-dust rule does not require showing of public nuisance). Conversely, many cases have held that a party seeking to show a nuisance is not required to show a violation of some other law. *See, e.g., Galaxy Carpet Mills, Inc. v. Massengill*, 338 S.E.2d 428, 429 (Ga. 1986) (permitting nuisance action related to pollution caused by coal-fired boilers even though owner had obtained environmental permits); *Urie v. Franconia Paper Corp.*, 218 A.2d 360, 362–63 (N.H. 1966) (permitting private nuisance action for pollution even though defendant complied with state environmental laws); *Tiegs v. Watts*, 954 P.2d 877, 883–84 (Wash. 1998) (finding defendant could be held liable for nuisance even though defendant had permit from department of ecology). *See generally* 58 Am. Jur. 2d *Nuisances* § 395, 873–74 (2012) ("A governmental license does not carry with it immunity for private injuries that may result directly from the exercise of the powers and privileges conferred."). Similarly, compliance with statewide air pollution regulations does not shield a defendant from trespass liability. *Cf. Borland*, 369 So. 2d at 526–27 (holding compliance with Alabama's air pollution control law does not shield a defendant from trespass liability).

Thus, a property owner seeking full compensation for harm related to the use and enjoyment of property at a specific location must resort to common law or state law theories to obtain a full recovery. *Cf. Md. Heights Leasing, Inc. v. Mallinckrodt, Inc.*, 706 S.W.2d 218, 221–22, 224, 226 (Mo. Ct. App. 1985) (discussing available damages and relief for

claims based on nuisance, negligence, and trespass theories). In addition, the common law offers the prospect of creative remedies, such as paying for clean-up costs or creation of a common law fund for compensation or restoration. *See* Czarnezki, 34 B.C. Envtl. Aff. L. Rev. at 27–35.

### B. Positions of the Parties.

1. *Plaintiffs.* The plaintiffs begin their attack on the district court's ruling by suggesting that we are required to approach the issue of federal preemption of state law with skepticism. They point to the well-established history of common law claims. They further note that several statutory provisions of the CAA demonstrate that Congress did not intend to preempt state common law actions. Turning to the caselaw, the plaintiffs argue that the reasoning in *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S. Ct. 805, 93 L. Ed. 2d 883 (1987), is applicable here and not the reasoning in *AEP*.

The plaintiffs note that there is no express preemption of state law causes of action in the CAA. As a result, any preemption of state law arises by implication only. According to the plaintiffs, such implied preemption is strongly disfavored and ordinarily to be avoided unless absolutely necessary. *Cf. Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447, 1459 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.").

Citing the language of the CAA, the plaintiffs note that the "any measures" clause demonstrates that the states retain broad authority over air pollution. Specifically, the any measures clause states: "[t]he reduction or elimination, *through any measures*, of the amount of

pollutants produced or created . . . and air pollution control [measures] at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3) (emphasis added). The plaintiffs contend that the plain language of the statute authorizes the states to reduce pollution through any measures, which include nuisance and common law claims.

The plaintiffs next draw our attention to the "citizens' rights" savings clause in the CAA, which in relevant part provides:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

*Id.* § 7604(e). The plaintiffs argue that the language of the citizens' rights savings clause demonstrates congressional intent not to preempt state statutory or common law claims related to air pollution.

The plaintiffs further cite another savings clause in the CAA entitled "Retention of State authority," which in relevant part provides:

> Except as otherwise provided . . . nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution . . . .

*Id.* § 7416. The plaintiffs contend that the retention of state authority savings clause demonstrates congressional intent to allow state statutory or common law causes of action respecting emissions of air pollutants.

The plaintiffs find support for their position in caselaw. The plaintiffs focus our attention on *Ouellette*. In *Ouellette*, a class of property owners on the Vermont side of Lake Champlain alleged the discharge of pollutants into the lake by a paper mill located in New York

constituted a continuing nuisance under Vermont common law. 479 U.S. at 483–84, 107 S. Ct. at 807, 93 L. Ed. 2d at 891. The defendant maintained that the lawsuit was preempted by the Clean Water Act (CWA), 33 U.S.C. §§ 1251–1387 (2010). *Id.* at 484, 107 S. Ct. at 807, 93 L. Ed. 2d at 892.

Like the CAA, the CWA contains two savings clauses. The "citizen suit" savings clause of the CWA provides: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief . . . ." 33 U.S.C. § 1365(e).

The CWA also has a "states' rights" savings clause, which provides:

> Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; . . . or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

*Id.* § 1370.

The Supreme Court in *Ouellette* concluded that while a Vermont common law nuisance claim could not be brought against a New York paper mill, the plaintiffs could bring a nuisance claim under New York common law. 479 U.S. at 497–500, 107 S. Ct. at 814–16, 93 L. Ed. 2d at 900–02. While the plaintiffs recognize that *Ouellette* was a case brought under the CWA, *see id.* at 483, 107 S. Ct. at 807, 93 L. Ed. 2d at 891, they claim that the reasoning of the case is fully applicable to cases brought under the CAA in light of the similarity of structure and language of the two statutes. *See Bell II*, 734 F.3d at 195 ("[A] textual

comparison of the two savings clauses [in the CAA and CWA] at issue demonstrates there is no meaningful difference between them.").

The plaintiffs further argue that Congress knew how to preempt state laws when it so desired. The CAA expressly preempts state law in some areas, for example, with respect to new motor vehicle emissions, fuel additives, and aircraft emissions. *See* 42 U.S.C. § 7543(a) (motor vehicles); *id.* § 7545(c)(4)(A) (fuel or fuel additives); *id.* § 7573 (aircraft emissions).

The plaintiffs argue the district court erred in relying on *AEP* instead of *Ouellette*. In *AEP*, the Supreme Court held that the CAA preempted potential claims under federal common law. 564 U.S. at ___, 131 S. Ct. at 2537, 180 L. Ed. 2d at 447. The plaintiffs argue that the separation of powers question presented in determining whether a federal statute preempts federal common law is fundamentally different from the federalism question raised in determining whether a federal statute preempts state common law. They note that *AEP* itself recognizes the distinction. *See* 564 U.S. at ___, 131 S. Ct. at 2535–37, 2540, 180 L. Ed. 2d at 445–47, 450–51. The plaintiffs claim that *AEP* does not alter the basic teaching of *Ouellette* and does not represent a shift in the Supreme Court's approach to federal preemption issues.

In support of their position, the plaintiffs cite two circuit court cases decided after *AEP*. First, the plaintiffs cite *Bell II*, where the Court of Appeals for the Third Circuit reversed a case on appeal that was cited by GPC and relied upon extensively by the district court, *Bell I*. *See Bell II*, 734 F.3d at 190. In *Bell II*, the Third Circuit followed *Ouellette* and held that the CAA did not preempt state common law claims in the source state. 734 F.3d at 196–97. Second, the plaintiffs note that a similar result with similar reasoning was obtained in the Court of

Appeals for the Second Circuit in *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96–103 (2d Cir. 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 1876, 188 L. Ed. 2d 912 (2014).

2.  *GPC.*  In response, GPC notes that the CAA preempts nonsource-state statutory law and federal common law.  *AEP*, 564 U.S. at ___, 131 S. Ct. at 2540, 180 L. Ed. 2d at 447; *TVA*, 615 F.3d at 296.  It invites us to take the next step and hold that the CAA also preempts source-state common law and statutory private actions.

GPC recognizes that in *Ouellette*, dictum indicates that the CWA did not preempt source-state common law.  *See* 479 U.S. at 497, 107 S. Ct. at 814, 93 L. Ed. 2d at 900.  But GPC suggests that events since *Ouellette* was decided have driven the law in a different direction.  Specifically, GPC points to amendments enacted to the CAA in 1990 and the recent decision of the United States Supreme Court in *AEP*.

GPC's narrative emphasizes that in 1990, three years after *Ouellette* was decided, Congress enacted the Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399 (1990).  Characterizing the amendments as "extensive," GPC notes that, among other things, the amendments required the EPA Administrator to conduct "a comprehensive analysis of the impact of this chapter on the public health, economy, and environment of the United States."  42 U.S.C. § 7612(a).  Further, in conducting the analysis, Congress required the Administrator to consider the effects of the CAA on "employment, productivity, cost of living, economic growth, and the overall economy of the United States."  *Id.* § 7612(c).  GPC asserts that the Clean Air Act Amendments of 1990 triggered a "regulatory tsunami" in environmental regulations, including the requirement that the EPA regulate carbon dioxide and other "greenhouse" gases.  *See Massachusetts v. EPA*, 549

U.S. 497, 528, 127 S. Ct. 1438, 1459, 167 L. Ed. 2d 248, 274 (2007) (holding that "the [CAA] authorizes EPA to regulate greenhouse gas emissions from new motor vehicles in the event that it forms a 'judgment' that such emissions contribute to climate change"). GPC seeks to escape the power of the 1987 language in *Ouellette* by urging this court to examine the CAA as it exists today.

Looking at the CAA today, GPC argues that *AEP*, and not *Ouellette*, is the most authoritative case from the Supreme Court. In reaching the conclusion that the CAA preempted federal common law, the *AEP* Court emphasized the first decider under the CAA is an expert administrative agency involved in the balancing of complex factors. 564 U.S. at ___, 131 S. Ct. at 2539, 180 L. Ed. 2d at 449. According to the *AEP* Court, such complex judgments are better left to an expert agency rather than individual district court judges who "lack the scientific, economic, and technological resources an agency can utilize" in deciding such issues. 564 U.S. at ___, 131 S. Ct. at 2539–40, 180 L. Ed. 2d at 450. While GPC recognizes that the narrow issue in *AEP* was whether federal common law was preempted by the CAA, *see id.* at ___, 131 S. Ct. at 2532, 180 L. Ed. 2d at 442, GPC argues that the reasoning in *AEP* on the federal common law preemption issue applies fully to the question of whether the CAA preempts state law, *see id.* at ___, 131 S. Ct. at 2537–38, 180 L. Ed. 2d at 447–48.

Casting a somewhat broader argument, GPC argues that common law and statutory actions such as those brought by the plaintiffs interfere with both the goals and method embraced by the CAA in regulating air pollution. According to GPC, interference with either is grounds for preemption. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881, 120 S. Ct. 1913, 1925, 146 L. Ed. 2d 914, 932 (2000) (holding

claims are preempted when they are " 'an obstacle to the accomplishment and execution of' . . . important means-related federal objectives" (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 581, 587 (1941))); *Ouellette*, 479 U.S. at 494, 107 S. Ct. at 813, 93 L. Ed. 2d at 898 ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach [the] goal [of eliminating water pollution].").

With respect to goals, GPC argues that allowing the plaintiffs' causes of action to proceed would upset the balance between environmental protection and economic disruption that Congress authorized the EPA to determine. *See AEP*, 564 U.S. at ___, 131 S. Ct. at 2539, 180 L. Ed. 2d at 449 (noting "[t]he [CAA] entrusts such complex balancing to EPA"). GPC maintains that the EPA has established a balanced approach to require transition to lower emitting equipment only when modification, replacement, or construction occurs. In this case, GPC claims that plaintiffs, among other things, are seeking to require GPC to install new equipment and take other equipment offline even though the EPA has not imposed a similar requirement. Such a requirement is contrary to *Goodell v. Humboldt County*, 575 N.W.2d 486, 500–01 (Iowa 1998), where we observed that a local law that would in effect prohibit what state law permitted could give rise to conflict preemption.

GPC also asserts that the goal of certainty is undermined by allowing the plaintiffs' claims to proceed. GPC relies on *TVA*, in which the Court of Appeals for the Fourth Circuit considered whether public nuisance claims related to air pollution could go forward. 615 F.3d at 296. The *TVA* court noted the complex balancing entrusted to the EPA, the comprehensive nature of the regulation, the scientific complexity of

many of the issues, and the reliance interests and expectations of enterprises that have complied with the CAA regulatory requirements, and reasoned that "individual states [should not] be allowed to supplant the cooperative federal-state framework that Congress through the EPA has refined over many years." *Id.* at 298–301. The *TVA* court noted that if nuisance suits were brought across the country, they would threaten to "overturn the carefully enacted rules governing airborne emissions" and "it would be increasingly difficult for anyone to determine what standards govern." *Id.* at 298.

GPC also asserts that private common law and state statutory actions would interfere with the law's method of achieving its goal and should therefore be preempted. *See Ouellette*, 479 U.S. at 494, 107 S. Ct. at 813, 93 L. Ed. 2d at 898. GPC argues the CAA provides a method for individuals to participate in decision making through the rulemaking process. According to GPC, a citizen cannot sidestep that process by bringing common law claims.

GPC further claims that the CAA amounts to a comprehensive scheme that occupies the entire regulatory field. It notes that Congress and the EPA have pervasively regulated the area of clean air and, relying on *TVA*, GPC argues that field preemption is an alternative route to affirm the district court. *See* 615 F.3d at 303.

Last, GPC attacks the plaintiffs' statutory analysis of the CAA. With respect to the retention of state authority savings clause, GPC notes that it allows a "[s]tate or political subdivision thereof to adopt or enforce" more stringent regulations. *See* 42 U.S.C. § 7416. GPC asserts that by its plain language, the retention of state authority savings clause does not authorize private common law or statutory causes of action, but only the imposition of more stringent standards by state or subdivision

regulators. *See* 42 U.S.C. § 7602(d) (defining state); *United States v. Amawi*, 552 F. Supp. 2d 679, 680 (N.D. Ohio 2008) (holding the judiciary is not a state or political subdivision); *Haudrich v. Howmedica, Inc.*, 642 N.E.2d 206, 209–10 (Ill. App. Ct. 1994) (same). GPC also argues that the CWA has stronger language than the retention of state authority savings clause of the CAA. In the CWA, Congress provided that nothing in the chapter shall "be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters . . . of such States." 33 U.S.C. § 1370. GPC notes that Congress did not include similar language in the CAA.

In any event, GPC argues that while a savings clause might prevent field preemption, it does not prevent conflict preemption. *See Geier*, 529 U.S. at 869, 120 S. Ct. at 1919, 146 L. Ed. 2d at 924; *Pokorny v. Ford Motor Co.*, 902 F.2d 1116, 1125 (3d Cir. 1990). Moreover, GPC asserts that the express language of the citizens' rights savings clause is limited to "this section," *see* 42 U.S.C. § 7604(e); Iowa Code § 455B.11, and, as a result, other sections of the CAA are not impacted by the savings clause and may preempt state common law and statutory claims.

**C. Analysis of CAA Preemption.**

1. *Introduction to federal preemption concepts.* GPC claims that the CAA preempts state common law actions. The concept of federal preemption is based upon the Supremacy Clause of the United States Constitution. Under the Supremacy Clause,

> [the] Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. The question of whether a federal statute preempts state common law is one of federal law and we are bound by the decisions of the United States Supreme Court in the area.

Under the Supremacy Clause, whether Congress sought to override or preempt any inconsistent state law turns on congressional intent. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250, 135 L. Ed. 2d 700, 715–16 (1996). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S. Ct. 538, 543, 172 L. Ed. 2d 398, 405 (2008); *accord* Scott Gallisdorfer, *Clean Air Act Preemption of State Common Law: Greenhouse Gas Nuisance Claims After* AEP v. Connecticut, 99 Va. L. Rev. 131, 140 (2013) [hereinafter Gallisdorfer].

Implied preemption falls into two categories: conflict preemption and field preemption. Conflict preemption occurs when a state law "actually conflicts" with a federal law, especially where it is impossible for a party to comply with both state and federal requirements. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 100 S. Ct. 2270, 2275, 110 L. Ed. 2d 65, 74 (1990). A variant of conflict preemption, obstacle preemption, may be found where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 228–29, 265 (2000) (internal quotation marks omitted). Field preemption occurs where the federal law so thoroughly occupies the field that Congress left no room for state law. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 2617, 120 L. Ed. 2d 407, 423 (1992); Gallisdorfer, 99 Va. L. Rev. at 141.

The Supreme Court, however, has been particularly reluctant to find federal preemption of state law in areas where states have traditionally exercised their police power. In *Rice*, the Supreme Court noted that preemption analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." 331 U.S. at 230, 67 S. Ct. at 1152, 91 L. Ed. at 1459. Further, the Supreme Court has emphasized that "when the text of an express pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Grp.*, 555 U.S. at 77, 129 S. Ct. at 543, 172 L. Ed. 2d at 406 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S. Ct. 1788, 1801, 161 L. Ed. 2d 687, 706 (2005)).

2. *Traditional application of federal common law or state law causes of action to environmental claims.* When dealing with interstate pollution, federal common law provided the rule of decision in a number of early cases. Prior to the recent *AEP* ruling in the Supreme Court, federal common law was utilized in numerous water pollution cases. As noted above, state claims of nuisance, negligence, and trespass are traditional causes of action that have been utilized in a wide variety of environmental contexts. Plainly, the existence of common law causes of action to address pollution has been part of the "historic police powers" of the states. *See Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442, 80 S. Ct. 813, 815, 4 L. Ed. 2d 852, 855 (1960) (noting the authority of states "to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power").

3. *Clean water precedents related to preemption of federal and state common law claims.* We begin our discussion of CAA preemption with an overview of clean water cases both prior to and after the passage of the CWA. These cases are instructive because of their discussion of the intergovernmental complexities surrounding pollution cases and because of the similarities in language and structure between the CWA and the CAA. In particular, the cases demonstrate the important distinction between whether a federal statute extinguishes federal common law, and whether a federal statute preempts state common law.

We begin our survey by noting the state of the law prior to the enactment of the CWA. Prior to the 1970s, the Supreme Court held that federal common law governed the use and misuse of interstate water. *See, e.g.*, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110, 58 S. Ct. 803, 811, 82 L. Ed. 1202, 1212 (1938); *Missouri v. Illinois*, 200 U.S. 496, 518–20, 26 S. Ct. 268, 268–69, 50 L. Ed. 572, 577–78 (1906).

In 1971, the Supreme Court suggested in dicta, however, that an interstate dispute between a state and a private company should be resolved by reference to state nuisance law. *See Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493, 498 n.3, 91 S. Ct. 1005, 1009 n.3, 28 L. Ed. 2d 256, 263 n.3 (1971) ("[A]n action such as this, if otherwise cognizable in federal district court, would have to be adjudicated under state law."). Thus, in the early 1970s, it was uncertain whether plaintiffs seeking to attack pollution in the waterways could bring their claims under federal common law or state common law.

In 1972, the United States Supreme Court decided *Illinois v. City of Milwaukee* (*Milwaukee I*), 406 U.S. 91, 92 S. Ct. 1385, 31 L. Ed. 2d 712 (1972). The case arose when Illinois moved for leave to file an original

action in the Supreme Court to enjoin Milwaukee from discharging sewage into Lake Michigan. *Id.* at 93, 92 S. Ct. at 1387–88, 31 L. Ed. 2d at 717. The Supreme Court concluded that Illinois could bring a claim under *federal* common law to abate a public nuisance in interstate or navigable waters. *Id.* at 106–07, 92 S. Ct. at 1394–95, 31 L. Ed. 2d at 725–26. The Supreme Court, however, foreshadowed the future and noted that "[i]t may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance." *Id.* at 107, 92 S. Ct. at 1395, 31 L. Ed. 2d at 725.

With respect to *state* common law, the *Milwaukee I* Court suggested that it was displaced by federal legislation and federal common law at least with respect to sources located in another state. The *Milwaukee I* Court noted that:

> [f]ederal common law and not the varying common law of the individual States is . . . entitled and necessary to be recognized as a basis for dealing in uniform standard with the environmental rights of a State against improper impairment by sources *outside* its domain.

*Id.* at 107 n.9, 92 S. Ct. at 1395 n.9, 31 L. Ed. 2d at 726 n.9 (emphasis added) (quoting *Texas v. Pankey*, 441 F.2d 236, 241 (10th Cir. 1971)).

In 1972, Congress adopted the CWA.[5] 33 U.S.C. §§ 1251–1387 (2012). The CWA contains a "citizen suit" savings clause in its remedies section, which provides:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

---

[5]The Federal Water Pollution Control Act of 1948 was significantly reorganized and expanded, and as amended became commonly known as the CWA.

*Id.* § 1365(e). The Senate Public Works Committee report in 1971 suggested that the citizen suit savings clause would specifically preserve any rights or remedies under any other law. *See* S. Rep. No. 92-414, at 81 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3746.

The CWA also contains a "states' rights" savings clause, which states: "[e]xcept as expressly provided . . . nothing in this chapter shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C. § 1370.

Finally, the CWA contains a "primary responsibilities and rights" provision. The primary responsibilities and rights provision declares that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id.* § 1251(b).

After the enactment of the CWA, the Supreme Court decided *City of Milwaukee v. Illinois* (*Milwaukee II*), 451 U.S. 304, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981). This case arose out of the ongoing efforts of Illinois, and later Michigan, to abate sewage discharges from the city of Milwaukee allegedly in violation of federal common law. *Id.* at 308–10, 101 S. Ct. at 1788–89, 68 L. Ed. 2d at 120–22. The Supreme Court granted certiorari to consider the effect of the CWA on the federal common law cause of action recognized by *Milwaukee I*. *Milwaukee II*, 451 U.S. at 307–08, 101 S. Ct. at 1787, 68 L. Ed. 2d at 120.

In *Milwaukee II*, the Supreme Court, consistent with its prediction in *Milwaukee I*, held in light of the passage of the CWA, federal common law related to pollution of the waterways was preempted. *Milwaukee II*, 451 U.S. at 317–19, 101 S. Ct. at 1792–93, 68 L. Ed. 2d at 126–28.

Speaking for a six-member majority, Justice Rehnquist observed in a footnote that:

> the question whether a previously available federal common-law action has been displaced by federal statutory law involves an assessment of the scope of the legislation and whether the scheme established by Congress addresses the problem formerly governed by federal common law.

*Id.* at 315 n.8, 332, 101 S. Ct. at 1792 n.8, 1800, 68 L. Ed. 2d at 125 n.8, 136. The *Milwaukee II* Court concluded that:

> Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency.

*Id.* at 317, 101 S. Ct. at 1792, 68 L. Ed. 2d at 126. The Court noted:

> Not only are the technical problems difficult—doubtless the reason Congress vested authority to administer the Act in administrative agencies possessing the necessary expertise— but the general area is particularly unsuited to the approach inevitable under a regime of federal common law [that would generate] 'sporadic' [and] 'ad hoc' [approaches to pollution control].

*Id.* at 325, 101 S. Ct. at 1796–97, 68 L. Ed. 2d at 131 (quoting S. Rep. No. 92-414, at 95).

The *Milwaukee II* Court, however, was careful to distinguish between federal common law and state common law. *See id.* at 310 n.4, 329, 101 S. Ct. at 1789 n.4, 1798, 68 L. Ed. 2d at 122 n.4, 134. While the Supreme Court declared that federal common law was displaced by the CWA, it expressly declined to consider whether plaintiffs could bring a claim under state common law. *Id.* at 310 n.4, 101 S. Ct. at 1789 n.4, 68 L. Ed. 2d at 122 n.4. In this regard, the Court noted:

> It is one thing . . . to say that States may adopt more stringent limitations through state administrative processes, or even that States may establish such limitations through

> state nuisance law, and apply them to in-state discharges. It is quite another to say that the States may call upon *federal* courts to employ *federal* common law to establish more stringent standards applicable to out-of-state dischargers.

*Id.* at 327–28, 101 S. Ct. at 1798, 68 L. Ed. 2d at 133.

Upon remand, the Court of Appeals for the Seventh Circuit in *Illinois v. City of Milwaukee* (*Milwaukee III*), considered whether the CWA precluded application of one state's common law against a pollution source located in a different state. 731 F.2d 403, 406 (7th Cir. 1984). The Seventh Circuit in *Milwaukee III* concluded that such state common law was preempted. *Id.* at 410–11. The Seventh Circuit was careful, however, to distinguish an effort to apply a state's common law against a polluter located outside the state and a common law claim against an in-state polluter. *See id.* at 414. The Seventh Circuit noted that an approach that allowed the application of state common law against an out-of-state polluter could lead to confusion, as a single source might be subject to different and conflicting state common law in a number of surrounding states, thereby leading to a "chaotic confrontation between sovereign states." *Id.* Yet, the Seventh Circuit recognized that the citizen suit savings clause preserved a right under state common law to obtain enforcement or prescribed standards or limitations against an in-state polluter. *Id.* at 413–14. The Supreme Court denied certiorari. 469 U.S. 1196, 105 S. Ct. 980, 83 L. Ed. 2d 981 (1985).

In 1987, the Supreme Court returned to the subject area in *Ouellette*. In *Ouellette*, a class of property owners on the Vermont side of Lake Champlain alleged that a paper mill located in New York discharged pollutants into the lake and constituted a nuisance under Vermont law. 479 U.S. at 483–84, 107 S. Ct. at 807, 93 L. Ed. 2d at 891. International Paper Co. moved for summary judgment, claiming that the CWA

preempted state common law claims under *Milwaukee III*. *Ouellette*, 479 U.S. at 484–85, 107 S. Ct. at 808–09, 93 L. Ed. 2d at 892–93. The federal district court denied summary judgment, citing the citizen suit savings clause and the states' rights savings clause of the CWA. *Id.* at 485, 107 S. Ct. at 808, 93 L. Ed. 2d at 892–93. The district court reasoned that state common law actions to redress interstate water pollution could be maintained under the law of the state where the injury occurred. *Id.* at 486, 107 S. Ct. at 808–09, 93 L. Ed. 2d at 893.

In *Ouellette*, the Supreme Court reversed the district court. *See id.* at 487, 101 S. Ct. at 809, 93 L. Ed. 2d at 893. The Supreme Court held that the CWA preempted state nuisance actions to the extent that state law applied to an alleged out-of-state polluter. *Id.* at 493–94, 107 S. Ct. at 812–13, 93 L. Ed. 2d at 897–98. The *Ouellette* Court recognized that states play a significant role in the protection of their own natural resources, that the CWA permits the EPA to delegate to a state the authority to administer permit programs with respect to certain sources of pollution within the state, and that a state may require discharge limitations more stringent than those required by the EPA. *Id.* at 489–90, 107 S. Ct. at 810, 93 L. Ed. 2d at 895.

Nonetheless, the *Ouellette* Court noted that with respect to out-of-state sources, the affected state's role is limited to the opportunity to object to the proposed standards of a federal permit in a public hearing. *Id.* at 490, 107 S. Ct. at 810–11, 93 L. Ed. 2d at 895. A state, however, does not have the authority to block the issuance of a permit with which it may be dissatisfied. *Id.* at 490, 107 S. Ct. at 811, 93 L. Ed. 2d at 896. In short, the state "may not establish a separate permit system to regulate an out-of-state source." *Id.* at 491, 107 S. Ct. at 811, 93 L. Ed. 2d at 896. The *Ouellette* Court noted that allowing affected states to

impose separate discharge standards on a single "point source" would interfere with the carefully devised regulatory system established by the CWA. *Id.* at 493, 107 S. Ct. at 812, 93 L. Ed. 2d at 898.

While the *Ouellette* Court held that the plaintiffs could not impose Vermont law on the out-of-state polluter, it emphasized that the Vermont residents were not without a remedy. *Id.* at 497, 107 S. Ct. at 814, 93 L. Ed. 2d at 900. According to the *Ouellette* Court, the citizen suit and states' rights savings clauses, jointly referred to by the Court as the "saving clause," preserves actions not incompatible with the CWA and "nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State." *Id.*

The *Ouellette* Court offered three reasons why an action brought against International Paper Co. under New York nuisance law would not frustrate the goals of the CWA. First, the *Ouellette* Court noted that imposing a source state's law does not affect the balance among federal, source-state, and affected-state interests, particularly in light of the specific authorization that allows source states to impose stricter standards. *Id.* at 498–99, 107 S. Ct. at 815, 93 L. Ed. 2d at 901. Second, the *Ouellette* Court noted that restricting common law actions to those of the source state "prevents a source from being subject to an indeterminate number of potential regulations." *Id.* at 499, 107 S. Ct. at 815, 93 L. Ed. 2d at 901. Finally, the *Ouellette* Court noted that states may be expected to take into account their own nuisance laws in setting permit requirements. *Id.*

Thus, under the CWA cases, a clear pattern emerges. Federal common law over pollution of interstate waterways is now preempted in light of the comprehensive nature of the CWA and the expertise vested in the EPA and state agencies to solve complex problems involved in

environmental issues.  State law claims against out-of-state sources are preempted because they would be inconsistent with the regulatory framework created by the CWA and would create chaos by imposing multiple regulatory schemes on a single source.  State law claims against in-state sources of pollution, however, are saved by the citizen suit savings clause, the states' rights savings clause, and other provisions of the CWA and are consistent with the principle that states may impose limitations on pollution more stringent than required by federal law.  As a result, state common law claims against an in-state source are not preempted by the CWA.

4.  *CAA precedent.*  The Supreme Court has not recently considered the scope of preemption of state common law under the CAA. We begin our discussion, however, with an important Supreme Court case that teed up the issue.  In *Massachusetts,* the Supreme Court considered a claim brought by a group of private organizations that filed a rulemaking petition asking the EPA to regulate greenhouse gas (GHG) emissions from new motor vehicles under the CAA.  549 U.S. at 505, 127 S. Ct. at 1446, 167 L. Ed. 2d at 260.  After an extensive notice and comment period, the EPA entered an order denying the rulemaking.  *Id.* at 511, 127 S. Ct. at 1449–50, 167 L. Ed. 2d at 263–64.  The EPA's stated reasons for denial were that the CAA did not authorize the EPA to issue mandatory regulations to address global climate change and that even if it did, it would be unwise to issue such regulations at this time. *Id.* at 511, 127 S. Ct. at 1450, 167 L. Ed. 2d at 264.  The Court of Appeals for the D.C. Circuit denied a petition to review the denial of rulemaking.  *Id.* at 511, 127 S. Ct. at 1451, 167 L. Ed. 2d at 265.

The Supreme Court reversed.  *Id.* at 535, 127 S. Ct. at 1463, 167 L. Ed. 2d at 278.  It held that the EPA did have authority to set

emissions standards and had offered no reasonable explanation for its failure to promulgate rules. 549 U.S. at 528, 534, 127 S. Ct. at 1459, 1463, 167 L. Ed. 2d at 274, 278.

After *Massachusetts*, the EPA began to incrementally regulate aspects of GHG emissions. *See* Gallisdorfer, 99 Va. L. Rev. at 131. Environmental groups were unsatisfied with the pace of EPA regulation, however, and began to file actions seeking injunctive caps on GHG emissions under a public nuisance theory. *See id.* Often, plaintiffs seeking to increase environmental protection from GHG emissions proceeded on a federal common law theory. *Id.*

In 2011, however, the Supreme Court decided *AEP*, in which eight states, New York City, and three nonprofit land trusts, brought an action seeking to enjoin GHG emissions from four private companies and the Tennessee Valley Authority. *See* 564 U.S. at ___, 131 S. Ct. at 2532, 180 L. Ed. 2d at 442. Because the EPA began regulating GHG emissions as a result of the *Massachusetts* case during the pendency of the lawsuit, the question arose as to whether the action of the EPA "displaced" the federal common law that was traditionally regarded as a source of law for interstate nuisance actions. *See id.* at ___, 131 S. Ct. at 2533–35, 180 L. Ed. 2d at 442–45.

In language similar to that used in *Milwaukee II*, the Supreme Court held that the CAA displaced federal common law with respect to GHG emissions. *AEP*, 564 U.S. at ___, 131 S. Ct. at 2537, 180 L. Ed. 2d at 447. The Supreme Court concluded that the CAA directly addressed the question because "air pollutants" were subject to regulation under the CAA and "air pollutants" clearly included GHG emissions. *Id.* at ___, 131 S. Ct. at 2532–33, 180 L. Ed. 2d at 442–43.

The Supreme Court in *AEP*, however, only held that *federal* common law regarding "air pollutants" was displaced by the CAA. *Id.* at ___, 131 S. Ct. at 2537, 180 L. Ed. 2d at 447. The Court declined to reach the state law nuisance claims because they had not addressed the issue on appeal. *Id.* at ___, 131 S. Ct. at 2540, 180 L. Ed. 2d at 450–51. The *AEP* Court noted, however, that "[l]egislative displacement of federal common law does not require the same sort of evidence . . . demanded for preemption of state law." *Id.* at ___, 131 S. Ct. at 2537, 180 L. Ed. 2d at 447 (quoting *Milwaukee II*, 451 U.S. at 317, 101 S. Ct. at 1792, 68 L. Ed. 2d at 126) (internal quotation marks omitted).

As previously noted, after *AEP*, two federal appellate courts considered whether the CAA preempted state law in the source state. *See Bell II*, 734 F.3d at 190, *cert. denied*, 82 U.S.L.W. 3531 (U.S. June 2, 2014) (No. 13–1013) (concluding that state law claims are not preempted); *MTBE Prods. Liab. Litig.*, 725 F.3d at 96–103 (finding that source-state common law claims are not preempted under the CAA).

One federal district court, however, came to a different conclusion. In *Comer I*, a federal district court found that state common law claims brought by property owners against several oil companies, coal companies, electric companies, and chemical companies, whose emissions allegedly contributed to global warming were preempted by the CAA. 839 F. Supp. 2d at 865.[6]

---

[6]On appeal, the case was reversed by a panel of the Court of Appeals for the Fifth Circuit. *Comer v. Murphy Oil USA, Inc. (Comer II)*, 585 F.3d 855, 859, 878–80 (5th Cir. 2009). However, in an unusual result, a petition for rehearing en banc was granted and then dismissed for a lack of quorum, with the result that the district court opinion stood. *See Comer v. Murphy Oil USA, Inc.*, 598 F.3d 208, 210 (5th Cir.), *dismissed on reh'g*, 607 F.3d 1049, 1055 (5th Cir. 2010).

Prior to *AEP,* federal caselaw on the question of CAA preemption of source-state common law was mixed. In *Her Majesty the Queen*, the Court of Appeals for the Sixth Circuit held that Canadian officials could seek to enjoin construction of a Michigan trash incinerator under Michigan law because of the alleged lack of air pollution control equipment, even though the facility had already received a CAA permit. 874 F.2d at 342–44. Similarly, in *Gutierrez v. Mobil Oil Corp.*, a federal district court held that plaintiffs could proceed on source-state common law claims alleging defendant negligently maintained storage facilities for various fuels. 798 F. Supp. 1280, 1281 (W.D. Tex. 1992).

However, in *TVA*, the Fourth Circuit reviewed a district court order granting an injunction at the behest of the State of North Carolina requiring the immediate installation of emissions controls at four Tennessee Valley Authority generating plants located in Alabama and Tennessee. 615 F.3d at 296. The injunction was based upon the district court's determination that the plants were a public nuisance under the law of the affected state, North Carolina. *Id.* The estimated cost of compliance with the order was uncertain, but North Carolina admitted that the cost would be in excess of one billion dollars. *Id.* at 298.

The Fourth Circuit reversed. *Id.* at 312. The Fourth Circuit found that the litigation amounted to a collateral attack on the process chosen by Congress to establish appropriate standards and grant permits for the operation of power plants. *See id.* at 302. The Fourth Circuit stressed that an "injunction-driven demand" for artificial changes was likely to be inferior to a system-based analysis of what changes would do the most good. *Id.* Yet, the Fourth Circuit did not hold that Congress had entirely preempted the field of emissions regulation. *Id.* Instead, each case had to be considered on a case-by-case basis to determine " 'if it interferes

with the methods by which the federal statute was designed to reach [its] goal.'" *Id.* at 303 (alteration in original) (quoting *Ouellette*, 479 U.S. at 494, 107 S. Ct. at 813, 93 L. Ed. 2d at 898). While the *TVA* court expressly disapproved of the application of the law of the affected state as contrary to *Ouellette*, *TVA*, 615 F. 3d at 308–09, the court further found "it would be difficult to uphold the injunctions because [the Tennessee Valley Authority's] electricity-generating operations are expressly permitted by the states in which they are located," *id.* at 309.

5. *Discussion.* All parties agree that nothing in the CAA expressly preempted the nuisance and common law actions presented in this case. Therefore, the question of whether the CAA preempted the claims in this case must rely on an implied preemption theory based upon either field preemption or conflict preemption.

*a. Field preemption.* We begin our discussion by noting that a party seeking to use implied field preemption to oust state law causes of action that have been traditionally part of the police power of the states faces an uphill battle. *See Huron*, 362 U.S. at 442, 80 S. Ct. at 815, 4 L. Ed. 2d at 855 (noting the authority of states "to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"). Congress unquestionably has the power to preempt local law when it acts on federal concerns and may expressly do so. To imply the ousting of traditional state law remedies such as nuisance by implication in a federal statute, though not impossible, seems at least improbable in most cases. In the case of the CAA, state regulation of pollution sources through source-state-law actions had to have been something of an obvious, yet unaddressed, issue when the statute was drafted. To suggest that Congress indirectly removed the state's ability to address

these environmental concerns with state law actions seems, on the surface at least, rather unlikely. At a minimum, to find implied field preemption, we think there should be powerful textual authority or structural issues that drive us in this counterintuitive direction.

When we look at the text of the CAA, we find language that tends to support the conclusion that Congress did not impliedly oust the state law actions of the source state. The any measures clause, the retention of state authority savings clause, and the citizens' rights savings clause strongly suggest that Congress did not seek to preempt, but to preserve, state law claims. *See* 42 U.S.C. §§ 7401(a)(3), 7416, 7604(e). The citizens' rights savings clause expressly states that the ability to bring actions under the CAA does not preempt common law rights. *See* 42 U.S.C. § 7604(e). While the term "requirements" in the retention of state authority savings clause is perhaps indefinite, most courts that have considered the question have concluded that the term includes common law duties. *See, e.g.*, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323–24, 128 S. Ct. 999, 1007–08, 169 L. Ed. 2d 892, 902–03 (2008); *Cipollone*, 505 U.S. at 521–22, 112 S. Ct. at 2620, 120 L. Ed. 2d at 426.

GPC suggests that allowing state law actions based on source-state law will undercut the structure of the CAA. We think not. The CAA statute was structured to promote cooperative federalism. Under the cooperative federalism approach, the states were given the authority to impose stricter standards on air pollution than might be imposed by the CAA. *See Bell II*, 734 F.3d at 197–98. In short, Congress expressly wanted the CAA to be a floor, but not a ceiling, on air pollution control. A similar conclusion has been reached by the Second, Third, and Sixth Circuits. *Id.* at 194–98; *MTBE Prods. Liab. Litig.*, 725 F.3d at 96–103; *Her Majesty the Queen*, 874 F.2d at 342–44.

GPC further suggests that because air pollution matters involve complex questions requiring the balancing of economic and social benefits and harms, controversies over source-state pollution are best left to administrative agencies and the rulemaking process. Further, GPC makes an appeal that there should be a uniform approach to these questions. This argument may have some policy appeal, but it runs against the grain of bilateral cooperative federalism manifest in the any measures clause, the retention of state authority savings clause, and the citizens' rights savings clause of the CAA. *See* 42 U.S.C. §§ 7401(a)(3), 7416, 7604(e).

GPC supports its argument with citation to language in *AEP* and *Comer I*. But GPC and some of the authority upon which it relies conflate the issue of displacement of federal common law with the somewhat related but distinct issue of preemption of state common law. We think two takeaway points from the Supreme Court's caselaw are (1) the question of displacement of federal common law is different than the question of preemption of state law actions, and (2) the standard for displacement of federal common law is different than the standard for preemption of state law. Further, in considering the issues of displacement of federal common law under the CWA and the CAA, the Supreme Court has not had to consider the statutory language in the CAA suggesting a congressional intent to not preempt state law.

GPC's argument that it will be subject to multiple regulators is also insufficient for us to find that all state law actions based upon source-state law are preempted because Congress occupied the field. With respect to this argument, it is important to remember the distinction in *Ouellette* and *Milwaukee II* between preemption of the law of a *source* state from the preemption of the law of the pollution-*affected* state.

*Ouellette*, 479 U.S. at 491–94, 107 S. Ct. at 811–13, 93 L. Ed. 2d at 896–98; *Milwaukee II*, 451 U.S. at 327–28, 101 S. Ct. at 1798, 68 L. Ed. 2d at 132–33. Allowing claims to go forward based on the law of the state merely affected by pollution could cause real structural problems as a multistate polluter could be subject to the laws of many states, which could impose contradictory and confusing legal requirements. The thrust of the *Ouellette* and *Milwaukee II* decisions is that allowing common law claims from all affected states would create chaos and cannot be allowed.

It is critical, however, to distinguish between efforts to apply the law of the source state and efforts to apply the law of the pollution-affected state. In this case we deal with a claim that seeks to regulate pollution based on the law of the source state. This is precisely the kind of cooperative federalism anticipated by the statute. GPC is not subject to a dozen or more regulatory regimes, but only two. The notion that a person must comply with parallel state and federal law requirements that may not be uniform is not new to the law. As recognized in *Ouellette*, on the one hand, state "nuisance law may impose separate standards and thus create some tension with the permit system," but, on the other hand, "the restriction of suits to those brought under source-state nuisance law prevents a source from being subject to an indeterminate number of potential regulations." *Id.* at 499, 107 S. Ct. at 815, 93 L. Ed. 2d at 901.

The conclusion that source-state common law claims are not preempted by the CAA is endorsed by treatise writers. *See* Grad § 18.02, at 18-4 to 18-5 ("Despite the overriding emphasis on federal and state statutes in the field of environmental law, common law remedies, even those old fashioned causes of trespass and nuisance, remain viable

causes of action."); Malone § 10:2, at 10-7 n.1 ("[S]tate common law theories of liability were not preempted by the [CAA]."); 1 William H. Rodgers, *Environmental Law* § 3:1(A)(1) (2013), *available at* www.westlaw.com ("[T]here is no question that nuisance law that was preserved has remained vibrant and serviceable.").

GPC seeks to avoid the teaching of *Milwaukee II* and *Ouellette* by suggesting that while state common law actions might not have been originally preempted by the CAA when *Milwaukee II* and *Ouellette* were decided, the Clean Air Act Amendments of 1990 and the dramatic growth in the complexity of clean air regulation now give rise to conflict preemption. According to GPC, this increasingly complex web of regulation was recognized in *AEP*, where the Supreme Court emphasized the complexity of environmental regulation and the difficulties of balancing competing interests in the formulation of environmental policy. *See* 564 U.S. at ___, 131 S. Ct. at 2539, 180 L. Ed. 2d at 449–50.

This argument has been zealously advanced by GPC and has some appeal. There is no question that the federal regulatory framework under the CAA is increasingly complicated. It is important in our view, however, not to conflate increased complexity with the issue of conflict preemption. Notwithstanding the increased complexity, the cooperative federalism framework and the notion that states may more stringently regulate remains a hallmark of the CAA.

Further, state common law and nuisance actions have a different purpose than the regulatory regime established by the CAA. The purpose of state nuisance and common law actions is to protect the use and enjoyment of specific property, not to achieve a general regulatory purpose. It has long been understood that an activity may be entirely lawful and yet constitute a nuisance because of its impairment of the use

and enjoyment of specific property. *See Galaxy Carpet Mills*, 338 S.E.2d at 429–30; *Urie*, 218 A.2d at 362; *Tiegs*, 954 P.2d at 883–84. We therefore decline to conclude that the increased complexity of the CAA has categorically elbowed out a role for the state nuisance and common law claims presented here.

*b. Conflict preemption.* GPC presents yet another refinement of its argument. While it may be that Congress has not impliedly occupied the field, case-by-case conflict preemption may arise in light of the dense federal regulations. In other words, while it may not be possible to declare that Congress has preempted source-state law in all cases involving emissions regulation, it has in cases that amount to a collateral attack on the NAAQS, SIP, and permitting method established by Congress under the CAA.

In support of this argument, GPC cites *TVA*. As noted above, in *TVA* the Fourth Circuit reversed an order granting injunctive relief to the State of North Carolina in a public nuisance action challenging the pollution from power plants located in Alabama and Tennessee. 615 F.3d at 296. The Fourth Circuit noted that it was estimated that the equipment modification ordered by the district court could cost in excess of one billion dollars. *Id.* at 298. The Fourth Circuit held that the injunction requiring extensive changes to equipment based on a public nuisance theory conflicted with the CAA where the existing equipment had been approved under the CAA regulatory framework. *See id.* at 302–03.

The approach of *TVA* has not been uniformly embraced in the federal courts. The conflict preemption analysis in *TVA* seems contrary to the approach of the Third Circuit in *Bell II*, 734 F.3d at 193–98 (finding "nothing in the [CAA] to indicate that Congress intended to

preempt source state common law tort claims."), and the Second Circuit in *MTBE Products Liability Litigation*, 725 F.3d at 95–104 (finding "[s]tate law [in the case] neither 'penalizes what federal law requires' nor 'directly conflicts' with federal law" and therefore the impossibility preemption defense did not overcome the presumption against preemption). *Cf. Merrick v. Diageo Americas Supply, Inc.*, No. 3:12-CV-334-CRS, 2014 WL 1056568, at *5–8 (W.D. Ky. Mar. 19, 2014) (disagreeing with *TVA* and following *Bell II* and *MTBE Products Liability Litigation*).

While we understand the reasoning in *TVA*, we do not think it provides a basis for summary judgment in this case. The plaintiffs seek damages related to specific properties at specific locations allegedly caused by a specific source. Of course, the plaintiffs must prevail on issues of substantive liability that the district court has not had occasion to address and are not before us now. If the plaintiffs do prevail on the merits, however, any remedy involving damages or remediation would simply not pose the kind of conflict with the permitting process that the sweeping injunction in *TVA* presented. *See id.* at 301–06. Any impact on the regulatory regime would be indirect and incidental. As a result, we conclude that conflict preemption with the CAA does not apply to a private lawsuit seeking damages anchored in ownership of real property. *See Bell II*, 734 F.3d at 189–90 (allowing private property owners' claims for nuisance, negligence, and trespass based on facility's flying ash and unburned by-products to go forward); *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 862 (Mo. Ct. App. 1985) ("States may be preempted from setting their own emissions standards, but they are not preempted from compensating injured citizens.").

With respect to the question of whether injunctive relief would conflict with the CAA, we do not find this issue ripe at this time. Even

*TVA* indicates that conflict preemption analysis is not subject to sweeping generalities and must be done on a case-by-case basis. *See* 615 F.3d at 302–03. We simply cannot evaluate the lawfulness of injunctive relief that has not yet been entered. Such an evaluation must await the development of a full record and the shaping of any injunctive relief by the district court.

**IV.  Discussion of Preemption by Iowa Code Chapter 455B.**

**A.  Positions of the Parties.**

1. *Plaintiffs.* The plaintiffs attack the district court's ruling on preemption under Iowa Code chapter 455B in several ways. The plaintiffs note that Iowa Code chapter 455B, like the CAA, has a citizens' rights savings clause, which provides: "[t]his section does not restrict any right under statutory or common law of a person or class of person to . . . seek other relief permitted under the law." Iowa Code § 455B.111(5). The plaintiffs contend the language simply means what it says and allows the statutory and common law claims they have brought in this case, which should be considered "other relief permitted under the law."

With respect to common law claims, the plaintiffs assert because there is no express preemption in Iowa Code chapter 455B, the defendants must rely on implied preemption. Implied preemption, however, is found only where " 'imperatively required,' " *Fabricius v. Montgomery Elevator Co.*, 254 Iowa 1319, 1322, 121 N.W.2d 361, 362 (1963) (quoting *Bradshaw v. Iowa Methodist Hosp.*, 251 Iowa 375, 388, 101 N.W.2d 167, 174 (1960)). The plaintiffs maintain that preemption here is not "imperatively required," as the common law claims specifically address harms to property, while the regulatory framework in Iowa Code chapter 455B addresses more general harms caused by pollution. The plaintiffs assert that Iowa caselaw supports this proposition. *See*

*Simpson v. Kollasch*, 749 N.W.2d 671, 674 (Iowa 2008) (indicating compliance with environmental regulation is not a defense to a nuisance claim, though it may be evidence of whether defendant's conduct is a nuisance); *Gerst v. Marshall*, 549 N.W.2d 810, 813–15 (Iowa 1996) (involving common law claims brought along with claims under chapter 455B).

The plaintiffs further note that their nuisance claim is based in part on Iowa Code chapter 657, which provides a general framework for bringing statutory nuisance claims in Iowa. In order to find that Iowa Code chapter 455B preempts the statutory provisions of Iowa Code chapter 657, the plaintiffs maintain that the two statutes must be "irreconcilably repugnant." *State v. Rauhauser*, 272 N.W.2d 432, 434 (Iowa 1978). The plaintiffs argue that far from being irreconcilable, the statutes may be harmonized by interpreting Iowa Code chapter 455B's citizens' rights savings clause as allowing statutory nuisance actions that may result in stricter control of pollution. Further, plaintiffs emphasize that claims under the nuisance statute protect against harms to specific property, while chapter 455B more generally protects the public from air pollution. Because the statutes address different types of harms and interests, the plaintiffs contend there can be no preemption of nuisance claims arising from Iowa Code chapter 455B.

Further, the plaintiffs note that the legislature has expressly provided that certain types of statutes do preempt statutory nuisance actions. Specifically, Iowa Code sections 657.1(2) and 657.11(1) provide that nuisance claims related to electrical utilities and animal feeding operations are preempted from further regulation through statutory nuisance claims. The plaintiffs press the point that the legislature knew how to preempt certain types of environmental claims from nuisance

actions but did not extend preemption to the plaintiffs' claims in this case.

Finally, the plaintiffs claim that if Iowa Code chapter 455B preempted state common law claims, a serious constitutional issue would be present. They note, for instance, we have held that giving farms immunity from nuisance suits may deprive one of the use and enjoyment of property and amount to an unconstitutional "taking" of property without due compensation. *Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 172–74 (Iowa 2004); *Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 320–21 (Iowa 1998). To the extent there is any doubt regarding the proper interpretation of Iowa Code chapter 455B, it should be interpreted in a fashion to avoid the constitutional problem. *Dalarna Farms v. Access Energy Coop.*, 792 N.W.2d 656, 663–64 (Iowa 2010).

2. *GPC.* Because state law preemption is substantively identical to federal conflict and field preemption, GPC incorporates its arguments regarding federal preemption on the question of whether Iowa Code chapter 455 preempted the common law claims in this case. GPC, however, presents some refinements based upon its analysis of the Iowa caselaw.

First, GPC points out that in order for state law to preempt common law claims based on field preemption, it is not necessary that it be impossible to reconcile the statute with the common law claims. GPC argues that in *Northrup v. Farmland Industries, Inc.*, we found that the Iowa Civil Rights Act was the exclusive remedy for wrongful discharge based on disability without a finding of impossibility. *See* 372 N.W.2d 193, 197 (Iowa 1985). Further, GPC argues that an action becomes irreconcilable with state law by imposing requirements beyond what the state law proscribes. For instance, in *Baker v. City of Iowa City,* we held

that an ordinance allowing claims against employers with fewer than four employees was irreconcilable with the Iowa Civil Rights Act, which provided claims could only be brought against employers with four or more employees. 750 N.W.2d 93, 101–02 (Iowa 2008).

Second, building on *Northrup* and *Baker,* GPC asserts that the common law claims in this case go beyond the state law framework in chapter 455 by circumventing the state's emissions regulation and permitting process and by potentially imposing new standards without the scientific expertise and extensive rulemaking process employed by the state environmental regulators. GPC argues that the court could order GPC to use certain processes or install new pollution control equipment, which could conflict with environmental regulatory requirements imposed on it by the Iowa Department of Natural Resources (DNR) or the EPA and further upset the delicate balance achieved through the regulatory process.

Therefore, GPC argues that if the plaintiffs prevail in their common law claims, GPC could end up in an intolerable catch-22 situation. For instance, GPC suggests that the state court in the common law actions might order a remedy that the DNR refuses to approve. In this setting, GPC would be forced to either comply with the district court order and defy the DNR, or vice versa. Or, the DNR could, after careful study, ultimately approve court-ordered changes to its operations as a result of the common law claims, but the necessary approvals might not be obtained quickly enough for timely compliance with the court's mandate. GPC argues this kind of trouble was addressed in *Goodell,* where the court noted that imposition of local requirements in excess of state law requirements could lead to preemption. 575 N.W.2d at 501 ("Any attempt by a local government to add to those requirements would

conflict with the state law, because the local law would in effect prohibit what the state law permits.").

**B.    Analysis of Iowa Code Chapter 455B Preemption.**   The precise question here is whether Iowa Code chapter 455B impliedly conflicts with and thus preempts a statutory claim for nuisance under Iowa Code chapter 657 and common law claims of nuisance, trespass, and negligence.    With respect to one statute impliedly preempting another, we have understandingly been quite demanding.    The legislature is presumed to know the existing state of the law when the new statute is enacted.  *Jahnke v. Incorporated City of Des Moines*, 191 N.W.2d 780, 787 (Iowa 1971).  In the absence of any express repeal, the new provision is presumed to accord with the legislative policy embodied in prior statutes.  *See Ruth Fisher Elementary Sch. Dist. v. Buckeye Union High Sch. Dist.*, 41 P.3d 645, 648 (Ariz. Ct. App. 2002).  When prior and later statutes deal with the same subject matter, although in apparent conflict, they should as far as reasonably possible be construed in harmony with each other to allow both to stand and be given force and effect.  *See Polk Cnty. Drainage Dist. Four v. Iowa Natural Res. Council*, 377 N.W.2d 236, 241 (Iowa 1985).  While we recognize the possibility of an implied repeal, such action is permitted only where the statutes "cover the same subject matter," are "irreconcilably repugnant," and implied repeal is "absolutely necessary."  *Rauhauser*, 272 N.W.2d at 434.  While the issue in this case does not require a complete repeal of Iowa Code chapter 657, we think the *Rauhauser* test remains applicable where a party seeks to nullify application of a preexisting statute to a specific circumstance.

With respect to whether a statute abrogates common law, the test is somewhat similar.   We have declared that absent express statutory

language, a party seeking to demonstrate that a statute impliedly overrides common law must show that this result is "imperatively required." *See, e.g., Rieff v. Evans*, 630 N.W.2d 278, 286 (Iowa 2001); *Collins v. King*, 545 N.W.2d 310, 312 (Iowa 1996). While the question of whether the CAA preempts state common law is a question of federal law, whether chapter 455B impliedly repeals or overrides common law is a question of state law.

There is no definitive Iowa case dealing with the question of whether nuisance or common law claims may go forward in light of the provisions of Iowa Code chapter 455B. In *Gerst*, a plaintiff raised parallel common law claims along with a citizen-action claim under Iowa Code chapter 455B. 549 N.W.2d at 813. We were not asked, however, to decide whether the nuisance and common law claims were extinguished by Iowa Code chapter 455B.

Nonetheless, we do have instructive caselaw. We have made clear that a lawful business, properly conducted, may still be a nuisance. For instance, in *Simpson* we noted in the context of the proposed construction of a hog-confinement facility that compliance with DNR regulations was not a defense to a nuisance action. 749 N.W.2d at 672, 674. We noted that " 'a lawful business, properly conducted, may still constitute a nuisance if the business interferes with another's use of his own property.' " *Id.* at 674 (quoting *Weinhold v. Wolff*, 555 N.W.2d 454, 461 (Iowa 1996)). Our approach is consistent with the law in other jurisdictions. *See, e.g., Flo-Sun, Inc. v. Kirk*, 783 So. 2d 1029, 1036 (Fla. 2001) (holding "something may legally constitute a public nuisance . . . although it may technically comply with existing pollution laws"); *Biddix v. Henredon Furniture Indus., Inc.*, 331 S.E.2d 717, 724 (N.C. Ct. App. 1985) (noting that the North Carolina Clean Water Act does not preempt

common law claims); *Gonzalez v. Whitaker*, 643 P.2d 274, 278 (N.M. Ct. App. 1982) (holding state environmental statutes do not preempt common law claims). *See generally*, Selmi § 10:26, at 10-56, 57.

We do not see enforcement of nuisance and other common law torts in this case as inconsistent with the regulatory framework established by chapter 455B. As indicated above, the nuisance and common law actions in this case are based on specific harms to the use and enjoyment of real property that are different from the public interest generally in controlling air pollution. We thus think the principles articulated in *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156 (Iowa 1996) ("Where the legislature has provided a comprehensive scheme for dealing with a specified kind of dispute, the statutory remedy provided is generally exclusive." (quoting IA C.J.S. *Actions* § 14 n.55 (1985))), and *Northrup*, 372 N.W.2d at 197 (holding remedy provided under Iowa Civil Rights Act "is exclusive"), are inapplicable. In short, we think Iowa Code chapter 455B did not impliedly repeal application of Iowa Code chapter 657 to air pollution claims or preempt Iowa common law.

With respect to remedies, GPC speculates that the district court could enter a remedy that conflicts with Iowa Code chapter 455B. As a result, GPC argues that the nuisance and common law claims should not be allowed to go forward. Any consideration of this possibility at this stage of the litigation, however, is premature. GPC has not demonstrated that the district court sitting in equity cannot fashion equitable relief that is consistent with Iowa Code chapter 455B. Specifically, to the extent the district court orders equitable relief, any such relief may be conditioned upon obtaining regulatory approvals required under Iowa Code chapter 455B. Or, equitable relief may require development of a

common fund to promote clean up that does not impact the requirements of Iowa Code chapter 455B at all. In any event, we decline to speculate at this stage about the possible legal issues that may be raised by the granting of any injunctive relief in this case.

## V. Discussion of Political Question Doctrine.

### A. Positions of the Parties.

1. *Plaintiffs.* The plaintiffs argue that the political question doctrine does not serve as an impediment to their statutory and common law claims. The plaintiffs note that political questions ordinarily involve questions for which there is a demonstrable constitutional commitment to other branches of government. The plaintiffs note that in *Des Moines Register & Tribune Co. v. Dwyer,* this court held the Iowa Constitution had "a textually demonstrable constitutional commitment" to the Iowa Senate of the power to establish its rules of proceedings. 542 N.W.2d 491, 496 (Iowa 1996). Unlike *Dwyer*, the plaintiffs argue, there is no demonstrable constitutional commitment involved in this case. Indeed, Congress has expressly authorized statutory and common law actions under state law. A state court deciding directly authorized litigation would not be expressing a lack of respect for Congress or any other coordinate branch of government.

The plaintiffs recognize that one of the criteria identified in *Baker v. Carr* and other political question doctrine cases is "a lack of judicially discoverable and manageable standards for resolving [the issue]." 369 U.S. 186, 217, 82 S. Ct. 691, 710, 7 L. Ed. 2d 663, 686 (1962). The plaintiffs agree that this case may involve social and economic issues to some extent, but that is in the nature of environmental litigation. According to the plaintiffs, courts have been deciding nuisance cases for years without invoking the political question doctrine. *See, e.g., Comer v.*

*Murphy Oil USA, Inc. (Comer II)*, 585 F.3d 855, 869–76 (5th Cir. 2009), *reh'g granted*, 598 F.3d 208, 210 (5th Cir.), *dismissed on reh'g for lack of quorum*, 607 F.3d 1049, 1055 (5th Cir. 2010); *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 321–32 (2d Cir. 2009) (lower court decision preceding *AEP*), *rev'd on other grounds*, 564 U.S. ___, 131 S. Ct. 2527, 180 L. Ed. 2d 435 (2011). This case is no more complex than thousands of other cases involving medical malpractice, copyright infringement, or patent protection. The plaintiffs argue that the political question doctrine does not permit a court to avoid a dispute merely because it presents complex or technical factual issues that the court "would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, ___ U.S. ___, ___, 132 S. Ct. 1421, 1427, 182 L. Ed. 2d 423, 429 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404, 5 L. Ed. 257, 291 (1821)).

Finally, on the question of whether the case is impossible to decide "without an initial policy determination of a kind clearly for nonjudicial discretion," *Baker*, 369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686, the plaintiffs contend the fact that the court or jury may have to determine what conduct is reasonable does not amount to a nonjusticiable question. They cite *McMahon v. Presidential Airways, Inc.*, where the court noted that in "an ordinary tort suit, there is no 'impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion.'" 502 F.3d 1331, 1365 (11th Cir. 2007) (quoting *Baker*, 369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686).

2. *GPC.* GPC claims that this case presents textbook political questions. No judge or jury could decide the claims, according to GPC, without balancing economic benefits against the harms caused by air pollution. It notes, for instance, that the balance between environmental

goals and economic growth involves a conflict between pollution control and new jobs. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 852 n.25, 104 S. Ct. 2778, 2786 n.25, 81 L. Ed. 2d 694, 708 n.25 (1984). GPC asserts that this balancing of interests is best left to the political branches of government. Allowing the statutory and common law claims to go forward, according to GPC, would amount to a collateral attack on the elaborate system created by Congress that will risk results that undermine the system's clarity and legitimacy. *TVA*, 615 F.3d at 301, 304.

**B. Analysis of Political Question Doctrine.**

1. *Overview of political question doctrine.* The federal political question doctrine arises largely from the United States Supreme Court case of *Baker*. In that case, the United States Supreme Court laid out six considerations for determining whether a political question was present:

> [(1)] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [(2)] a lack of judicially discoverable and manageable standards for resolving it; or [(3)] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [(5)] an unusual need for unquestioning adherence to a political decision already made; or [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686.

The high-water mark of the federal political question doctrine appears to be matters involving foreign affairs, determinations of the propriety of congressional enactments, and matters related to the legislative process. *See, e.g., Nixon v. United States*, 506 U.S. 224, 226, 236–38, 113 S. Ct. 732, 734, 739–40, 122 L. Ed. 2d 1, 7, 13–14 (1993);

*Goldwater v. Carter*, 444 U.S. 996, 1002–06, 100 S. Ct. 533, 536–38, 62 L. Ed. 2d 428, 430–32 (1979) (Rehnquist, J., concurring in judgment).

The federal political question doctrine has been the subject of extensive commentary.  Some question whether there is any legitimate basis for it.  *See* Louis Henkin, *Is There a "Political Question" Doctrine?*, 85 Yale L.J. 597, 600 (1976) ("[T]here may be no doctrine requiring abstention from judicial review of 'political questions.' "); Martin H. Redish, *Judicial Review and the "Political Question,"* 79 Nw. U. L. Rev. 1031, 1031 (1984) (noting commentators have "disagreed about [the federal political question doctrine's] wisdom and validity").  Other commentators have defended the federal political question doctrine.  *See* J. Peter Mulhern, *In Defense of the Political Question Doctrine*, 137 U. Pa. L. Rev. 97 (1988).

It has also been observed that since *Baker*, the doctrine has fallen into disuse in the United States Supreme Court.  *See* Rachel E. Barkow, *More Supreme than Court?:  The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy*, 102 Colum. L. Rev. 237, 263 (2007).  Since *Baker*, the federal political question doctrine has been invoked successfully in only three cases.  *See Vieth v. Jubelirer*, 541 U.S. 267, 281, 124 S. Ct. 1769, 1778, 158 L. Ed. 2d 546, 560 (2004) (holding gerrymanding claim nonjusticiable); *Nixon*, 506 U.S. at 226, 113 S. Ct. at 734, 122 L. Ed. 2d at 7 (concluding question whether the Senate rule regarding impeachment is constitutional is nonjusticiable); *Gilligan v. Morgan*, 413 U.S. 1, 5–6, 10, 93 S. Ct. 2440, 2443, 2446, 37 L. Ed. 2d 407, 413, 415 (1973) (holding determination of adequacy of national guardsmen training exclusively vested in Congress).  Even if one is inclined to adopt a political question doctrine of some kind, there is a question of scope.  The six considerations listed by Justice Brennan in

*Baker, see* 369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686, are both opaque and elastic. Some commentators advocate consideration of all of them, usually in descending order of importance as recognized by the plurality opinion in *Vieth, see* 541 U.S. at 278, 124 S. Ct. at 1776, 158 L. Ed. 2d at 558. Others urge a narrower approach through what has been termed the "classical" model, which emphasizes, if not requires, a constitutionally based commitment of power to another branch of government. *See* Amelia Thorpe, *Tort-Based Climate Change Litigation and the Political Question Doctrine*, 24 J. Land Use & Envtl. L. 79, 80 (2008). It is important to note, however, that the United States Supreme Court has made clear that the federal political question doctrine does not apply to state courts. *See Goldwater*, 444 U.S. at 1005 n.2, 100 S. Ct. at 538 n.2, 62 L. Ed. 2d at 430 n.2 (Rehnquist, J., concurring) ("This Court, of course, may not prohibit state courts from deciding political questions, any more than it may prohibit them from deciding questions that are moot, so long as they do not trench upon exclusively federal questions of foreign policy." (Citation omitted.)).

Whether and to what extent state courts should adopt the federal political question doctrine is a question of some controversy. Several decades ago, Oregon Supreme Court Justice Hans Linde remarked that "there are hardly any state analogues to the self-imposed constraints on justiciability, 'political questions,' and the like." Hans A. Linde, *Judges, Critics, and the Realist Tradition*, 82 Yale L. J. 227, 248 (1972). While Linde's observation may be overstated, Helen Hershkoff has noted that state courts do tend to hear an array of questions that would be considered nonjusticiable in federal court. *See* Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function*, 114 Harv. L. Rev. 1833, 1863 (2001). Two former state supreme court

justices have observed the significant differences between separation of powers under state constitutions as compared to under the Federal Constitution. *See* Christine M. Durham, *The Judicial Branch in State Government: Parables of Law, Politics, and Power*, 76 N.Y.U. L. Rev. 1601, 1603 (2001) ("State constitutions have a tradition independent of federal law in the allocation of power among the branches of state government and in their development and understanding of republican principles."); Ellen A. Peters, *Getting Away from the Federal Paradigm: Separation of Powers in State Courts*, 81 Minn. L. Rev. 1543, 1558 (1997) ("State courts are regularly called upon to enforce state constitutional obligations that, for sound reasons of federalism, federal courts have declined to enforce." (Footnote omitted.)). If so, the federal political question doctrine might have limited value for state courts.

In some state courts, the doctrine seems to be met with some skepticism. *See Backman v. Secretary*, 441 N.E.2d 523, 527 (Mass. 1982) ("[W]e have never explicitly incorporated the [political question] doctrine into our State jurisprudence . . . . [T]his court has an obligation to adjudicate claims that particular actions conflict with constitutional requirements."). Other state courts, however, have cited federal precedent solely as if the doctrine were binding on state courts, mixed federal and state cases without any clear delineation, and even simply used the label "political question" without meaningful case citation or analysis. *See* Christine M. O'Neill, *Closing the Door on Positive Rights: State Court Use of the Political Question Doctrine to Deny Access to Educational Adequacy Claims*, 42 Colum. J.L. & Soc. Probs. 545, 560–76 (2009) (categorizing cases according to citation methodology).

The political question doctrine has rarely provided the basis for a holding in our cases. One exception is *Dwyer*, a case in which we

considered whether the Iowa Senate's policy on release of certain long-distance phone records fell within the constitutionally granted power to the Senate to determine its own rules of proceedings. 542 N.W.2d at 493. We held that because of the demonstrable constitutional commitment to the Senate of the power to make its own rules in article III, section 9 of the Iowa Constitution, the lawsuit filed by the newspaper to obtain the records raised a nonjusticiable political question. *Id.* at 494, 501.

Similarly, in *State ex rel. Turner v. Scott*, we considered an action brought by the attorney general to remove Scott from his Senate seat. 269 N.W.2d 828, 828 (Iowa 1978). Relying upon article III, section I of the Iowa Constitution (which vests authority upon each house to judge the qualifications of its own members) we held that the case presented a political question that should be resolved by the Senate. *Id.* at 830–31. The holdings in *Dwyer* and *Scott* are consistent with the narrower classical model of the political question doctrine, which focuses on the textually demonstrable constitutional commitment of decision-making power to another branch of government, the first *Baker* factor, 369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686.

As is often the case, however, the plaintiffs do not question whether the political question doctrine applies in state court and whether we should adopt a political question doctrine for Iowa that departs from the federal approach. In somewhat similar circumstances, where a party does not suggest a different standard under Iowa law, we adopt for the purposes of the case the federal standard, reserving the right to apply the standard differently than under the federal cases. *See, e.g., State v. Becker*, 818 N.W.2d 135, 150 (Iowa 2012) ("Even where a party has not provided a substantive standard independent of federal law, we reserve the right to apply the standard presented by the party in a fashion

different than the federal cases."); *NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 45 (Iowa 2012) ("Even in cases where a party has not suggested that our approach under the Iowa Constitution should be different from that under the Federal Constitution, we reserve the right to apply the standard in a fashion at variance with federal cases under the Iowa Constitution."); *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009); *In re Det. of Hennings*, 744 N.W.2d 333, 338–39 (Iowa 2008). We reserve the right to apply the federal standards differently because the six factors in *Baker* are not clearly defined and are open-ended. As a result, within the *Baker* framework, there is a wide range of permissible analysis on each of the factors. We therefore proceed to utilize the federal *Baker* approach, reserving the right to apply these standards in a fashion different from federal precedent.

2. *Discussion.* From any perspective, it is clear that there is no textual constitutional commitment of the issues raised in this case to another branch of government. The first and most important factor of the *Baker* formula is thus plainly not present and cuts markedly against any application of the political question doctrine here. *See Klinghoffer v. S.N.C. Anchille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 49 (2d Cir. 1991) ("Although no one factor is dispositive, Justice Brennan, the author of *Baker*, has suggested that the first [factor] . . . is of particular importance . . . [and the absence of this factor] strongly suggests that the political question doctrine does not apply." (Citation omitted.)).

We now move to the second factor, namely, a lack of judicially discoverable and manageable standards to resolve the issues. Tort law, however, including the law of nuisance, has evolved over the centuries. The law has devised a number of doctrinal approaches to accommodate

difficulties in proof associated with complex environmental and toxic tort cases. *See* Benjamin Ewing & Douglas A. Kysar, *Prods and Pleas: Limited Government in an Era of Unlimited Harm*, 121 Yale L.J. 350, 370 (2011). As a result, the United States Supreme Court has never found a lack of judicially manageable standards in a tort suit involving private parties. *Id.* at 412. The caselaw generally stands for the proposition that actions for damages are relatively immune to efforts to dismiss based upon the political question doctrine. *See, e.g.*, *Gordon v. Texas*, 153 F.3d 190, 195 (5th Cir. 1998) ("Monetary damages might but typically do not require courts to dictate policy . . . nor do they constitute a form of relief that is not judicially manageable."); *Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992) ("Damage actions are particularly judicially manageable."); *Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 679–80, 683 (E.D. La. 2006) (holding demand for damages justiciable); *Mallinckrodt, Inc.*, 706 S.W.2d at 221 ("[I]ndividual tort recoveries . . . are not precluded by the political question doctrine. Appellants are not trying to establish standards that conflict with legislative determinations; they are seeking compensation for injuries." (Citation omitted.)).

To the extent the science is obscure and complex, the burden of proof of all elements of causation remains on the plaintiffs. The mere fact that a case is complex does not satisfy this factor. As noted by the Second Circuit in *AEP,* courts have successfully adjudicated complex common law public nuisance claims for more than a century. *Am. Elec. Power Co.*, 582 F.3d at 326; *Alperin v. Vatican Bank*, 410 F.3d 532, 552 (9th Cir. 2005) (noting the political question doctrine does not arise because the case "is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint").

Turning to the third factor, there is no need for an initial policy determination by another branch of government. Indeed, the tort law itself represents an initial policy determination, namely, that certain plaintiffs who demonstrate necessary harm to the use and enjoyment of their real property may be entitled to damages and injunctive relief. *See Am. Elec. Power Co.*, 582 F.3d at 331; *McMahon*, 502 F.3d at 1364–65; *Klinghoffer*, 937 F.2d at 49 ("The fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question.").

With these major factors removed, the remaining factors generally fall out of the equation. None of the remaining *Baker* factors are very strong in any approach to the political question doctrine and they certainly do not provide a basis for nonjusticiability in this case.

As is apparent from the above analysis, none of the *Baker* factors apply in this case with much force. We therefore conclude that this case is not subject to dismissal under the political question doctrine.

## VI. Conclusion.

For all of the above reasons, we conclude that the plaintiffs' claims in this case are not preempted by the CAA, are not preempted by Iowa Code chapter 455B, and are not subject to dismissal by operation of the political question doctrine. Our rulings on these issues, of course, express no view on the appropriateness of class certification or on the underlying merits of the plaintiffs' claims. We do conclude, however, that GPC was not entitled to summary judgment. As a result, the judgment of the district court is reversed and the case is remanded for further proceedings.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur, expect Mansfield, J., who takes no part.